STATE OF CONNECTICUT *v.* ROBERT COURCHESNE
(SC 16665)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

*(One justice concurring separately; one justice concurring and dissenting; two justices dissenting in one opinion)*

Argued April 26, 2002—officially released March 11, 2003

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Eva B. Lenczewski*, senior assistant state's attorney, for the appellant (state).

*Mark Rademacher*, assistant public defender, with whom, on the brief, was *Ronald Gold*, senior assistant public defender, for the appellee (defendant).

*Opinion*

BORDEN, J. Under our statutory scheme, a defendant becomes eligible for the death penalty if he is convicted of a capital felony for the "murder of two or more persons at the same time or in the course of a single transaction . . . ." General Statutes (Rev. to 1997) § 53a-54b (8), as amended by No. 98-126, § 1, of the 1998 Public Acts (P.A. 98-126).[1] One of the aggravating factors that permits the imposition of the death penalty is that "the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ." Gen-

---

[1] General Statutes (Rev. to 1997) § 53a-54b, as amended by P.A. 98-126, § 1, provides: "A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the Division of State Police within the Department of Public Safety or of any local police department, a chief inspector or inspector in the Division of Criminal Justice, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, an employee of the Department of Correction or a person providing services on behalf of said department when such employee or person is acting within the scope of his employment or duties in a correctional institution or facility and the actor is confined in such institution or facility, or any fireman, while such victim was acting within the scope of his duties; (2) murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain; (3) murder committed by one who has previously been convicted of intentional murder or of murder committed in the course of commission of a felony; (4) murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment; (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) the illegal sale, for economic gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone; (7) murder committed in the course of the commission of sexual assault in the first degree; (8) murder of two or more persons at the same time or in the course of a single transaction; or (9) murder of a person under sixteen years of age."

Unless otherwise indicated, references in this opinion to § 53a-54b are to the 1997 revision, as amended by P.A. 98-126, § 1, which was in effect at the time the crimes here were committed. The legislature subsequently amended § 53a-54b to eliminate subdivision (6) of the capital felony statute, which included a death resulting from the sale of drugs to the victim. Public Acts 2001, No. 01-151, § 3.

eral Statutes (Rev. to 1997) § 53a-46a (i) (4).[2] Although

[2] General Statutes (Rev. to 1997) § 53a-46a provides: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of or pleads guilty to a capital felony, the judge or judges who presided at the trial or before whom the guilty plea was entered shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, and any aggravating factor set forth in subsection (i). Such hearing shall not be held if the state stipulates that none of the aggravating factors set forth in subsection (i) of this section exists or that any factor set forth in subsection (h) exists. Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause, or (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (i) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the aggravating factors set forth in subsection (i) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury or, if there is no jury, the court shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of

in *State* v. *Breton*, 235 Conn. 206, 220 n.15, 663 A.2d

which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury or, if there is no jury, the court shall return a special verdict setting forth its findings as to the existence of any factor set forth in subsection (h), the existence of any aggravating factor or factors set forth in subsection (i) and whether any aggravating factor or factors outweigh any mitigating factor or factors found to exist pursuant to subsection (d).

"(f) If the jury or, if there is no jury, the court finds that (1) none of the factors set forth in subsection (h) exist, (2) one or more of the aggravating factors set forth in subsection (i) exist and (3) (A) no mitigating factor exists or (B) one or more mitigating factors exist but are outweighed by one or more aggravating factors set forth in subsection (i), the court shall sentence the defendant to death.

"(g) If the jury or, if there is no jury, the court finds that (1) any of the factors set forth in subsection (h) exist, or (2) none of the aggravating factors set forth in subsection (i) exists or (3) one or more of the aggravating factors set forth in subsection (i) exist and one or more mitigating factors exist, but the one or more aggravating factors set forth in subsection (i) do not outweigh the one or more mitigating factors, the court shall impose a sentence of life imprisonment without the possibility of release.

"(h) The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (e), that at the time of the offense (1) he was under the age of eighteen years or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (4) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(i) The aggravating factors to be considered shall be limited to the following: (1) The defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony; or (2) the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offenses or of one or more state offenses and one or more federal offenses for each of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another

1026 (1995), we had been asked to decide whether it was necessary for the state, in order to seek the death penalty based on that factor, to prove that the defendant had killed "both . . . of the victims in an especially cruel manner," rather than just one of the victims, we ultimately did not have to answer that question because the evidence was sufficient to show that he had done so with respect to both victims. The present case, however, requires us to decide that question.

Thus, the sole issue of this appeal is whether, when the defendant has been convicted of a capital felony for the murder of two persons in the course of a single transaction, in violation of § 53a-54b (8), the state, in order to establish the aggravating factor defined by § 53a-46 (i) (4), must prove that the defendant murdered both victims in an especially heinous, cruel or depraved manner.[3] We conclude that proof that the defendant committed at least one of the murders in the specified aggravated manner is sufficient. Accordingly, we reverse the ruling of the trial court to the contrary.

The state charged the defendant with capital felony in violation of § 53a-54b (8) by murdering two persons, namely, Demetris Rodgers and Antonia Rodgers, in the course of a single transaction.[4] The defendant waived

person; or (3) the defendant committed the offense and in such commission knowingly created a grave risk of death to another person in addition to the victim of the offense; or (4) the defendant committed the offense in an especially heinous, cruel or depraved manner; or (5) the defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value; or (7) the defendant committed the offense with an assault weapon, as defined in section 53-202a."

[3] Pursuant to General Statutes § 52-265a and Practice Book §§ 83-1 and 61-6 (c), the Chief Justice granted the state's request to appeal from the interlocutory ruling of the trial court that, in order for the death penalty to be imposed, the state must prove that both murders were committed in the aggravated manner.

[4] The information contained four counts. In the first count, the state charged the defendant with intentionally murdering Demetris Rodgers in

a jury trial on the guilt phase, and elected to be tried by a three judge court.[5] The trial court, *West*, *Cofield* and *D'Addabbo*, *Js.*, found the defendant guilty. The defendant then moved to dismiss the aggravating factor and for the court to impose a life sentence without the possibility of release, on the basis that there was insufficient evidence to justify holding a penalty hearing. The trial court, *D'Addabbo*, *J.*, denied the motion to dismiss, concluding that the defendant was not entitled to a prehearing determination by the court on the sufficiency of the evidence. In the course of its decision, however, the court also ruled that, as a matter of law, the state, in order to prove the noticed aggravating factor, would be required to prove at the penalty hearing that, as to the conviction of capital felony in violation of § 53a-54b (8), both murders were committed in an especially heinous, cruel or depraved manner. This interlocutory appeal followed.

For purposes of this appeal only, the following facts may be considered as undisputed. In the late evening

---

violation of General Statutes § 53a-54a (a). In the second count, the state charged the defendant with intentional murder in violation of § 53a-54a (a) under a transferred intent theory, namely, that, with the intent to kill Demetris Rodgers, he killed a second person, namely, Antonia Rodgers, by causing her to be deprived of oxygen. In the third count, the state charged the defendant with capital felony under § 53a-54b (8) by murdering both Demetris Rodgers and Antonia Rodgers in the course of a single transaction. In the fourth count, the state charged the defendant with capital felony in violation of § 53a-54b (9) under a transferred intent theory, namely, that, with the intent to kill Demetris Rodgers, the defendant murdered Antonia Rodgers, who was under sixteen years of age. In connection with this information, prior to trial, the state filed a notice of the aggravating factor that it intended to prove, that the defendant committed the capital offense in an especially heinous, cruel or depraved manner under § 53a-46a (i) (4).

The trial court found the defendant guilty on all four counts. This appeal, however, involves only the applicability of the aggravating factor to the third count, under which the defendant was found guilty of the murder of two persons in the course of a single transaction.

[5] The defendant has elected to have the penalty phase heard by a jury. That proceeding awaits our decision in this appeal.

hours of December 15, 1998, the defendant stabbed Demetris Rodgers to death. At the time she was stabbed, she was pregnant with Antonia Rodgers. Although Demetris Rodgers was dead on arrival at the hospital, the physicians at the hospital performed an emergency cesarean section and delivered Antonia Rodgers, who lived for forty-two days before dying from global anoxic encephalopathy, or deprivation of oxygen to the brain.[6]

## I

The state claims that, when a defendant has been convicted of capital felony for the murder of two persons in the course of a single transaction, the state, in order to prove the aggravating factor that the defendant committed the offense in an especially heinous, cruel or depraved manner, need only do so with respect to one of the murder victims. We agree.

This claim presents a question of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Id.; *Carpenteri-Waddington, Inc.* v. *Commis-*

---

[6] The defendant moved to dismiss the capital felony counts and the murder count involving Antonia Rodgers on the ground that, because she had been in utero when the defendant stabbed Demetris Rodgers, Antonia was not a "person" within the meaning of the homicide provisions of the Penal Code. The trial court, *Damiani, J.,* denied that motion. That ruling is not before us in this appeal.

*sioner of Revenue Services,* 231 Conn. 355, 362, 650 A.2d 147 (1994); *United Illuminating Co.* v. *Groppo,* 220 Conn. 749, 755–56, 601 A.2d 1005 (1992). . . . *United Illuminating Co.* v. *New Haven,* 240 Conn. 422, 431–32, 692 A.2d 742 (1997)." (Internal quotation marks omitted.) *Bender* v. *Bender,* 258 Conn. 733, 741, 785 A.2d 197 (2001).

We have interpreted the aggravating factor involved to mean that "the defendant engaged in intentional conduct that inflicted extreme physical or psychological pain [suffering] or torture on the victim above and beyond that necessarily accompanying the underlying killing, *and* that the defendant specifically intended to inflict such extreme pain [suffering or] torture . . . or . . . the defendant was callous or indifferent to the extreme physical or psychological pain, suffering or torture that his intentional conduct in fact inflicted on the victim." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Johnson,* 253 Conn. 1, 66–67, 751 A.2d 298 (2002). We conclude that, under our death penalty statutory scheme, if the defendant's mental state and conduct meet these requirements with respect to one of his victims, the aggravating factor is satisfied. Put another way, it is not necessary under that statutory scheme that the defendant in the present case intentionally, or callously or indifferently, inflicted extreme pain, suffering or torture on both of his victims, so long as he is shown to have done so with respect to one of his victims.

We begin our analysis with the language of the statutes presently at issue, namely, §§ 53a-46a (f) (2) and (i) (4) and 53a-54b (8). Both parties rely on what each claims to be the plain language of certain of these statutes to support their respective positions.

The state points to the language of § 53a-46a (f) (2), namely, that if "*one* or more of the aggravating factors

set forth in subsection (i) exist"; (emphasis added); the death penalty may be imposed, provided, of course, that the other requirements of the statute are met.[7] Thus, the state contends, "the torture of one victim of a capital felony satisfies the plain language of § 53a-46a (f) (2), which demands proof of but one aggravating factor."

The defendant contends, to the contrary, that the plain language of §§ 53a-46a (i) (4) and 53a-54b (8) compels the conclusion that both murders must be committed in the manner proscribed by the aggravating factor in order for the factor to be established. The defendant points to the language of § 53a-46a (i) (4): "[T]he defendant committed *the offense* in an especially heinous, cruel or depraved manner . . . ." (Emphasis added.) He then points to the language of § 53a-54b (8) defining the relevant capital felony as the *"murder of two or more persons* at the same time or in the course of a single transaction . . . ." (Emphasis added.) Thus, the defendant argues, "the essential gravamen of the offense set forth at § 53a-54b (8) that must be 'especially heinous' is the 'murder of two or more persons,' not the murder of one person."

We acknowledge that, if we were to apply the applicable language literally, as a purely linguistic matter the defendant's contention probably carries more weight than that of the state. It would be linguistically appealing to adopt the syllogism embodied in the defendant's contention, namely, that: (1) § 53a-46a (i) (4) requires that "the offense" be committed in the aggravated manner; (2) the likely referent of "the offense" is the capital felony of which the defendant has been convicted; (3) that capital felony at issue in the present case is the

---

[7] The additional requirements are that either no mitigating factor exists, or the aggravating factor or factors outweigh the mitigating factor or factors. General Statutes (Rev. to 1997) § 53a-46a (f).

"murder of two or more persons," as defined in § 53a-54b (8); and (4) therefore, the murder of *two* persons must be committed in the aggravated manner. Thus, under the defendant's position, there is a direct linguistic line between the language, "the offense," contained in § 53a-46a (i) (4), and the definition of the capital felony as the "murder of two . . . persons," contained in § 53a-54b (8).

The state's plain language argument is not as linguistically appealing. There is no direct linguistic line between the language, "one or more aggravating factors set forth in subsection (i) [of § 53a-46a]," contained in § 53a-46a (f) (2), and the definition of the capital felony, contained in § 53a-54b (8). Subsection (i) of § 53a-46a lists seven potential aggravating factors, of which the commission of the offense in a cruel manner is only one. The likely reference of "one," in the language, "one or more of the aggravating factors," contained in § 53a-46a (f) (2), is to that set of seven factors, and provides no more than that the state must prove at least one, and may prove more than one, of those factors in order to meet its initial burden in seeking the death penalty following a conviction of an underlying capital felony. Linguistically, however, that reference offers little, if any, help in deciding the question posed by this appeal, namely, the meaning of the language, "the defendant committed the offense in an especially heinous, cruel or depraved manner"; General Statutes (Rev. to 1997) § 53a-46a (i) (4); as applied to the capital felony of the "murder of two or more persons at the same time or in the course of a single transaction . . . ." General Statutes (Rev. to 1997) § 53a-54b (8), as amended by P.A. 98-126, § 1.

The conclusion that would flow from the linguistic analysis suggested by the defendant, however, cannot withstand further scrutiny. Although the language of the statute, viewed literally and in isolation, suggests

a conclusion consistent with the interpretation offered by the defendant, when viewed in its context and history leads us to conclude, to the contrary, that when § 53a-46a (i) (4) refers to "the offense," as applied in the circumstances of the present case, it means the murder of either of the "two" persons referred to in § 53a-54b (8), and does not mean both murders.

First, as our case law demonstrates, the "constituent parts" of the capital felony involved here are two murders that are committed in the course of a single transaction. See *State* v. *Solek*, 242 Conn. 409, 423, 699 A.2d 931 (1997) ("constituent parts" of capital felony under § 53a-54b [7] are murder and sexual assault in first degree). Thus, the reference in § 53a-46a (i) (4) to "the offense" must be read as referring to those constituent parts. This reading permits the interpretation that the aggravating factor may be satisfied by proof of its existence with respect to at least one of those constituent parts. See *State* v. *Ross*, 230 Conn. 183, 264, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 138 L. Ed. 2d 1095 (1995) (aggravating factor satisfied by proof of existence "beyond the elements of the [capital felony] charged"). Put another way, it would permit the interpretation that the language, "the offense," refers to either of those parts, and does not necessarily refer to *both, and only both,* of those parts.

Second, the context and legislative genealogy of § 53a-54b (8) strongly support the conclusion that the aggravating factor involved here need only attach to one of the murders. When this state's death penalty legislation was first reenacted in 1973; Public Acts 1973, No. 73-137, § 3; following the decision of the United States Supreme Court in *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), invalidating all states' death penalty statutes, the list of capital felonies included murder by a kidnapper of a kidnapped person during the course of the kidnapping, but did not

include either § 53a-54b (7) ("murder committed in the course of the commission of sexual assault in the first degree"), or § 53a-54b (8) ("murder of two or more persons at the same time or in the course of a single transaction"). See General Statutes (Rev. to 1975) § 53a-54b.[8] In addition, under that original statutory scheme, the aggravating factor involved in this case was the same as it is today. See General Statutes (Rev. to 1975) § 53a-46a (g) (4).[9] Both subdivision (7), namely, murder committed in the course of a sexual assault, and subdivision (8), namely, murder of two or more persons at the same time or in the course of a single transaction, were added to § 53a-54b in 1980 by Public Acts 1980, No. 80-335 (P.A. 80-335).[10]

[8] General Statutes (Rev. to 1975) § 53a-54b provided: "A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the state police department or of any local police department, a county detective, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, an official of the department of correction authorized by the commissioner of correction to make arrests in a correctional institution or facility, or of any fireman, as defined in subsection (10) of section 53a-3, while such victim was acting within the scope of his duties; (2) murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain; (3) murder committed by one who has previously been convicted of intentional murder or murder committed in the course of commission of a felony; (4) murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment; (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) the illegal sale, for gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone, provided such seller was not, at the time of such sale, a drug-dependent person."

[9] General Statutes (Rev. to 1975) § 53a-46a (g) provided in relevant part: "If no factor set forth in subsection (f) is present, the court shall impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict as provided in subsection (d) that . . . (4) the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ."

[10] Public Act 80-335 provided: "A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the division

Thus, in 1973, the original death penalty legislation contained at least one capital felony that involved a murder in the course of another serious felony, namely, murder in the course of a kidnapping, and contained the same aggravating factor involved in the present case. Under that statutory scheme, there were six forms of capital felony, designated in general terms as follows: (1) murder of certain law enforcement, corrections or firefighting officials; (2) murder for hire; (3) murder by a previously convicted murderer; (4) murder by one under a life sentence; (5) murder by a kidnapper during the course of a kidnapping; and (6) death directly resulting from the illegal sale of cocaine, heroin or methadone by a person who is not drug-dependent. General Statutes (Rev. to 1975) § 53a-54b. Subdivisions (1) through (4) and (6) of § 53a-54b involved only one underlying offense. For subdivisions (1) through (4), that offense was murder, which was then further defined either by the motive for the murder, such as

of state police within the department of public safety or of any local police department, a chief inspector or inspector in the division of criminal justice, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, an official of the department of correction authorized by the commissioner of correction to make arrests in a correctional institution or facility, or of any fireman, as defined in subsection (10) of section 53a-3, while such victim was acting within the scope of his duties; (2) murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain; (3) murder committed by one who has previously been convicted of intentional murder or murder committed in the course of commission of a felony; (4) *murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment;* (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) the illegal sale, for gain, of cocaine, heroin or methadone to a person who dies *as a direct result of the use by him of such cocaine, heroin or methadone,* provided such seller was not, at the time of such sale, a drug-dependent person; *(7) MURDER COMMITTED IN THE COURSE OF THE COMMISSION OF SEXUAL ASSAULT IN THE FIRST DEGREE; (8) MURDER OF TWO OR MORE PERSONS AT THE SAME TIME OR IN THE COURSE OF A SINGLE TRANSACTION.*"

murder for hire, by the prior criminal status of the defendant, namely, murder by a convicted murderer or by one under a life sentence, or by the status of the victim, namely, murder of a law enforcement, corrections or firefighting official. As to subdivision (6), the underlying offense was death resulting from the specified illegal drug sales. Subdivision (5) of § 53a-54b, however, involved two underlying offenses, namely, murder and kidnapping.

It cannot be disputed that, with respect to all of the capital felonies that involved only one underlying offense, the aggravating factor at issue in the present case need only have applied to that sole underlying offense. We can conceive of no rationale for the legislature to have set a higher bar to the imposition of the death penalty when the underlying capital felony involved, not one, but two underlying serious felonies, namely, kidnapping and murder. We are constrained to conclude, therefore, that when our statutory scheme was first enacted in 1973, the aggravating factor, as applied to the capital felony of "murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety"; General Statutes (Rev. to 1975) § 53a-54b (5); did not have to apply to both the underlying felonies, namely, kidnapping and murder.

In 1980, the legislature added to the capital felony statute two offenses that were similar in nature; they both involved two underlying felonies, namely, murder in the course of a sexual assault in the first degree, and two or more murders committed either at the same time or in the course of a single transaction. See P.A. 80-335. Therefore, after the enactment of the 1980 legislation, our death penalty statutory scheme contained three capital felonies that involved murder plus another serious felony: (1) murder plus kidnapping; (2) murder plus sexual assault in the first degree; and (3) murder

plus murder. General Statutes (Rev. to 1981) § 53a-54b. Both before and after the 1980 legislation, the aggravating factor remained the same, namely, that the offense was committed in a heinous, cruel or depraved manner. On the basis of this history, and in the absence of evidence to the contrary, we conclude that the legislature intended all three of these capital felonies to be treated the same with respect to the unchanged aggravating factor of heinous, cruel or depraved conduct.[11]

We can conceive of no reason why the legislature, in adding the two additional capital felonies that it did in 1980, would have intended that, with respect to a murder committed in the course of a kidnapping or sexual assault, it would be sufficient, with regard to the imposition of the death penalty, for the state to prove the aggravating factor with respect to just *one* of the underlying felonies, but with respect to the murder of two persons in the course of a single transaction, the state would be required to prove the aggravating factor with respect to *both* of the underlying felonies. Indeed, to attribute such an intent to the legislature, or, to put it another, more accurate way, to attribute such a meaning to the legislative language, would be to attribute to that language a perverse result.[12]

---

[11] As in *State* v. *Breton*, supra, 235 Conn. 206, in our prior cases involving death penalties imposed by application of the pertinent aggravating factor to capital felonies involving underlying sexual assault-murders and kidnapping-murders, it was not necessary to confront the question posed by the present case, because in each case the evidence supported application of the aggravating factor to both underlying felonies. See *State* v. *Cobb*, 251 Conn. 285, 449–50, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Webb*, 238 Conn. 389, 485–88, 680 A.2d 147 (1996); *State* v. *Ross*, supra, 230 Conn. 262–65.

[12] The dissent criticizes this reasoning on the basis that, because, prior to 1980, the legislature had included kidnap-murder as a capital felony but had not included two murders within the definition of capital felony, "the system of deterrence that the legislature adopted in 1973 is exactly the system that the majority now suggests [would be] irrational." The dissent asserts, therefore, that our reasoning is "inexplicable." The dissent misconstrues our reasoning. Under the legislative capital felony scheme as enacted in 1973, the legislature had made the policy choice not to include multiple

It would mean that when, in the course of a single transaction, a capital felon committed two felonies of unequal seriousness on *one* victim—unequal because one of those felonies does *not* involve the death of the victim—the aggravating factor need only apply to *one* of the underlying felonies; but when, in the course of a single transaction, a capital felon committed *the most serious* felony on *two* victims, *each* resulting in the death of the victim, the aggravating factor must apply to *both* of the underlying felonies. A capital felon who murdered two persons in the course of a single transaction must be regarded, under any rational system of deterrence and moral hierarchy, as at least equally subject to deterrence and at least equally morally blameworthy to one who murders and either kidnaps or sexually assaults only one victim in the course of a single transaction. We cannot conceive of any legislative rationale pursuant to which the legislature would have intended, when it added multiple murder to the definition of capital felony, to set a higher bar to the imposition of the death penalty on multiple murder in a single transaction than it would have for murder-kidnap or murder-sexual assault in a single transaction. "The legislature cannot have intended such an interpretation when it enacted P.A. 80-335 . . . because it would lead to bizarre results." *State* v. *Solek*, supra, 242 Conn. 423.

Indeed, as part of his plain language argument, the defendant posits that, "[i]f the legislature had intended the essential gravamen [of the offense set forth at § 53a-

---

murders within the definition of capital felony. Therefore, the question of whether that was a rational choice never was presented to this court. The question that *has* been presented to us in this case is whether, when it did decide to include multiple murders in the capital felony scheme in 1980, the legislature intended for the state to have a heavier burden with respect to the aggravating factor as applied to that crime than every other offense, including kidnap-murder, already included in that scheme. We answer that question in the negative.

54b (8)] to have been only one of the murders, it would have said that it was a capital felony to commit murder during the commission of another murder," as the legislature did say with respect to both sexual assault-murder and kidnap-murder.[13] Thus, the defendant implicitly concedes that, with respect to both sexual assault-murder and kidnap-murder, the aggravating factor need not apply to both of the underlying offenses,[14] and, if the statutory formulation were as he posits with respect to a double murder, namely, "murder committed in the course of the commission of another murder," the aggravating factor would apply to either murder.

This argument poses the wrong question. The question of statutory interpretation is not, as the defendant's argument suggests, if the legislature meant that, why did it not say so? The question is, what did the legislature mean by what it *did* say? Furthermore, with regard to the question posed by the present case, we see no substantive difference between the two formulations: (1) what the legislature did say in § 53a-54b (8), namely, the "murder of two or more persons at the same time or in the course of a single transaction"; and (2) what the defendant contends the legislature would or should

[13] Section 53a-54b (5) defines the capital offense of kidnap-murder as *"murder by a kidnapper* of a kidnapped person *during the course of the kidnapping* or before such person is able to return or be returned to safety . . . ." (Emphasis added.) Subsection (7) of § 53a-54b similarly defines sexual assault-murder as "murder *committed in the course of the commission of* sexual assault in the first degree . . . ." (Emphasis added.)

[14] The defendant argues, however, that, in any event, the aggravating factor must apply to the murder, and not to the other underlying felony. The state contends that it may apply to either underlying offense. The interpretation offered by the dissent would, in effect, agree with the state. We need not resolve that issue, however, in the present case, because the facts of the case present only the question of whether the claimed aggravating factor applied to *both murders.* To adopt the interpretation offered by both the state and the dissent would require an expansion of the definition of "especially heinous, cruel or depraved manner," which heretofore has focused solely on the killing, and not on any other conduct.

have said if it meant something different, namely, "murder committed in the course of the commission of another murder." In short, we cannot place on these two differing linguistic formulations the weight that the defendant would attribute to them.

The defendant also relies on the rules of strict construction and lenity in interpreting criminal statutes, and emphasizes their special pertinence to death penalty statutes. See, e.g., *State* v. *Harrell*, 238 Conn. 828, 832–33, 681 A.2d 944 (1996) (statutory construction implicating death penalty must be based on conclusion that legislature has clearly and unambiguously made intention known, and rules of strict construction and lenity especially pertinent to death penalty statute); see also *State* v. *Rawls*, 198 Conn. 111, 121, 502 A.2d 374 (1985) (fundamental tenet to resolve doubts in enforcement of Penal Code against imposition of harsher punishment). We are unpersuaded, however, that these rules require a different conclusion in the present case.

First, those rules apply when "a contrary interpretation would [not] frustrate an evident legislative intent"; *State* v. *Ross*, supra, 230 Conn. 200; and when, after the court has engaged in the full process of statutory interpretation, there is nonetheless a reasonable doubt "about [the] statute's intended scope . . . ." (Internal quotation marks omitted.) *State* v. *Sostre*, 261 Conn. 111, 120, 802 A.2d 754 (2002). Second, the rules of strict construction and lenity, like all such axioms of construction, are "important guideline[s] to legislative meaning, but [they] cannot displace the result of careful and thoughtful interpretation." *United Illuminating Co.* v. *New Haven*, supra, 240 Conn. 460. After engaging in the full process of statutory construction, we are not left with a reasonable doubt about the statute's intended

scope.[15] Furthermore, those rules cannot be applied so as to yield a bizarre result. *State* v. *Solek*, supra, 242 Conn. 423. In the present case, in our view, the interpretation offered by the defendant: would frustrate the legislature's intent; would displace the result of careful and thoughtful interpretation; and would yield a bizarre result. We decline, therefore, to apply those rules so as to yield the result that the aggravating factor must apply to both murders.

The defendant also relies on what he characterizes as the structure of the capital felony statute, namely, that it divides capital felonies into two categories: one, focusing on the culpability of the defendant;[16] and the other, focusing on the status of the victim.[17] He contends that the capital felony in the present case falls into the former category, because "[t]he defendant's contemporaneous behavior in murdering a second person is like the prior conduct specified in sub[division] (3) of the

---

[15] Thus, we disagree with the conclusion of the dissent, namely, that there is a reasonable doubt about the intended scope of the statute. The dissent's conclusion implies that the rule of lenity would apply in every case in which the defendant was able to muster a plausible, albeit erroneous, interpretation of a criminal statute.

Indeed, that is precisely how the dissent in fact applies the rule of lenity. Although it disagrees with the defendant's interpretation, namely, "that the state must prove . . . that both murders were committed in a cruel manner," the dissent nonetheless "would uphold the trial court's application of the rule of lenity and require that the state prove beyond a reasonable doubt that both murders were committed in a cruel manner . . . ." This is solely because, in the dissent's view, the defendant's interpretation appears to be plausible. This use of the rule of lenity would mean that, as a practical matter, in all but the rarest of cases of statutory interpretation of criminal statutes, the defendant would necessarily prevail. We disagree that the rule of lenity has such a broad scope and overarching function.

[16] In this category, the defendant puts murder for hire, murder by a previously convicted murderer, and murder by one under a life sentence. General Statutes (Rev. to 1997) § 53a-54b (2), (3) and (4).

[17] In this category, the defendant puts murder of a law enforcement officer, murder of a kidnap victim, murder of a sexual assault victim, and murder of a person under sixteen years of age. General Statutes (Rev. to 1997) § 53a-54b (1), (5), (7) and (9).

capital felony statute (a prior murder conviction) and that in sub[division] (4) (a conviction resulting in a life sentence). It is also like the contemporaneous behavior of contracting to kill in sub[division] (2)." This, he asserts, supports the conclusion that the legislature intended the aggravating factor to apply to both murders. This argument is unconvincing.

First, the defendant's classification is arbitrary, at least when applied to the offense in the present case. It is difficult to see why a capital felony defined as the murder of two or more persons at the same time or in the course of a single transaction focuses more on the defendant's conduct than on the status of the victims. In our view, the fact that there are two victims of the defendant's murderous conduct in the present case, rather than one, is as much a focus on the victims as it is on the defendant's conduct. Indeed, other capital felonies in the defendant's proffered classification of capital felonies based on the status of the victim could just as easily be put in the category of culpability based on the defendant's conduct. See, e.g., General Statutes (Rev. to 1997) § 53a-54b (7), as amended by P.A. 98-126, § 1 ("murder committed in the course of the commission of sexual assault in the first degree"). Second, we simply fail to see how such a classification, if it were employed, illuminates the meaning of the statutory language at issue in the present case. Moreover, there is nothing in the language or structure of the statute to suggest that the legislature intended any such classifications to yield significantly different results with respect to eligibility for the death penalty.

The defendant also argues that the "legislature knew how to define a capital offense so that the cruel aggravating factor would apply to only one of [the] two murders," because when it did so it used the language "in the course of," such as "murder committed in the course of" a sexual assault, or murder of a kidnapped person

"during the course of" the kidnapping. This argument ignores, however, the fact that this capital felony also uses that language, namely, "murder of two or more persons at the same time *or in the course of a* single transaction . . . ." (Emphasis added.) General Statutes (Rev. to 1997) § 53a-54b (8), as amended by P.A. 98-126, § 1. It cannot be, moreover, that the legislature intended the aggravating factor to apply differently, depending on whether the two murders were committed "at the same time" or "in the course of a single transaction," as the defendant's argument suggests.

Finally, the defendant draws support for his position from the fact that our statutory scheme uses language that differs from that used in other states, and also differs from that used by certain proposed model statutes, such as the Model Penal Code and a proposed 1973 federal death penalty statute. See S. Rep. No. 93-721 (1974). Certain of those other statutes and statutory proposals use language similar to that suggested previously by the defendant, namely, "murder in the course of another murder." According to the defendant, those other statutory formulations do permit the death penalty to be imposed in multiple murder situations without their analogs to our aggravating factor being applied to both murders. Thus, the defendant suggests that we should infer a legislative intent to embrace a different result based on our language, because it differs from the language of those formulations.

Suffice it to say that, in the absence of some strong indication that, when the legislature added the murder of two persons to the list of capital felonies in 1980, it specifically intended a result different from that yielded by those other statutes or statutory proposals, we are not inclined to draw such an inference. There is no such indication in the legislative history. Simply because our legislature did not use precisely the same language as that used or proposed for use by other legislative bodies

to address a similar situation, namely, multiple murders as laying the basis for a potential death penalty, does not require a conclusion that it also intended a different result, especially when, as in the present case, we can see no substantive difference between our language and those other statutory formulations. We, therefore, conclude that the state need only prove that the defendant killed one of the victims in an especially heinous, cruel or depraved manner, pursuant to § 53a-46 (i) (4), in order to seek the death penalty based on that factor.

## II

We take this opportunity to clarify the approach of this court[18] to the process of statutory interpretation.[19]

[18] We note that, although Justice Katz has filed a partial dissenting opinion regarding the application of the death penalty, she joins part II of this opinion. Thus, this court, by a vote of five to two, endorses the process of statutory interpretation that we outline herein. We clarify our approach at this time, in this en banc decision, because, as is indicated by the majority opinion and the concurring and dissenting opinion, the appropriate approach to the process of statutory interpretation presents questions that have divided the court. Thus, resolution of those questions will affect, not only the present case, but other pending and future cases, and will give guidance to the bench and bar.

[19] We acknowledge at the outset that the particular approach to the judicial process of statutory interpretation, as formulated and explained herein, that we now specifically adopt, has not been adopted in the same specific formulation by any other court in the nation. Alaska, however, specifically has rejected the "plain meaning rule," which we discuss later in this opinion in further detail, and has, in effect, adopted much the same comprehensive approach to determining the meaning of legislative language that we now adopt. See *Wold* v. *Progressive Preferred Ins. Co.*, 52 P.3d 155 (Alaska 2002); *State* v. *Alex*, 646 P.2d 203 (Alaska 1982); *State Dept. of Natural Resources* v. *Haines*, 627 P.2d 1047 (Alaska 1981); *North Slope Borough* v. *Sohio Petroleum Corp.*, 585 P.2d 534 (Alaska 1978). In addition, by statute, Texas specifically provides that, "[i]n construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the: (1) object sought to be attained; (2) circumstances under which the statute was enacted; (3) legislative history; (4) common law or former statutory provisions, including laws on the same or similar subjects; (5) consequences of a particular construction; (6) administrative construction of the statute; and (7) title (caption), preamble, and emergency provision." Tex. Gov't Code Ann. § 311.023 (Vernon 1998).

It is evident, therefore, that both Alaska and Texas, by judicial decision

For at least a century, this court has relied on sources beyond the specific text of the statute at issue to determine the meaning of the language as intended by the legislature. See, e.g., *State* v. *Briggs*, 161 Conn. 283, 288–90, 287 A.2d 369 (1971); *Muller* v. *Town Plan & Zoning Commission*, 145 Conn. 325, 329, 142 A.2d 524 (1958); *Connecticut Rural Roads Improvement Assn.* v. *Hurley*, 124 Conn. 20, 25, 197 A. 90 (1938); *Corbin* v. *Baldwin*, 92 Conn. 99, 105, 101 A. 834 (1917); *Seidel* v. *Woodbury*, 81 Conn. 65, 71–74, 70 A. 58 (1908). For that same period of time, however, this court often has eschewed resort to those sources when the meaning of the text appeared to be plain and unambiguous. See, e.g., *State* v. *Simmons*, 155 Conn. 502, 504, 234 A.2d 835 (1967); *Niedzwicki* v. *Pequonnock Foundry*, 133 Conn. 78, 82, 48 A.2d 369 (1946); *O'Brien* v. *Wise & Upson Co.*, 108 Conn. 309, 318–19, 143 A. 155 (1928); *Bridgeport Projectile Co.* v. *Bridgeport*, 92 Conn. 316, 318, 102 A. 644 (1917); *Lee Bros. Furniture Co.* v. *Cram*, 63 Conn. 433, 437–38, 28 A. 540 (1893).

In 1994, however, we noted a dichotomy in our case law regarding whether resort to extratextual sources was appropriate even in those instances where the text's meaning appeared to be plain and unambiguous. In *Frillici* v. *Westport*, supra, 231 Conn. 430–31 n.15, we stated: "It is true that, in construing statutes, we have often relied upon the canon of statutory construction that we need not, and indeed ought not, look beyond the statutory language to other interpretive aids unless the statute's language is not absolutely clear and unambiguous. See, e.g., *State* v. *Cain*, 223 Conn. 731, 744–45, 613 A.2d 804 (1992); *Mercado* v. *Commissioner*

and statute, respectively, view the process of statutory interpretation in much the same way as we do. In any event, despite our numerically minority status, we conclude that the approach we outline herein most appropriately accomplishes the judicial task of ascertaining the meaning of legislative language.

*of Income Maintenance,* 222 Conn. 69, 74, 607 A.2d
1142 (1992); *Rose* v. *Freedom of Information Commis-
sion,* 221 Conn. 217, 225, 602 A.2d 1019 (1992); *Ander-
son* v. *Ludgin,* 175 Conn. 545, 552–53, 400 A.2d 712
(1978). That maxim requires some slight but plausible
degree of linguistic ambiguity as a kind of analytical
threshold that must be surmounted before a court may
resort to aids to the determination of the meaning of
the language as applied to the facts of the case. See,
e.g., *Sanzone* v. *Board of Police Commissioners,* 219
Conn. 179, 187, 592 A.2d 912 (1991). It is also true,
however, that we have often eschewed such an analyti-
cal threshold, and have stated that, in interpreting stat-
utes, we look at all the available evidence, such as the
statutory language, the legislative history, the circum-
stances surrounding its enactment, the purpose and
policy of the statute, and its relationship to existing
legislation and common law principles. See, e.g., *Flem-
ing* v. *Garnett,* 231 Conn. 77, 91–92, 646 A.2d 1308
(1994); *State* v. *Metz,* 230 Conn. 400, 409, 645 A.2d 965
(1994); *Glastonbury Volunteer Ambulance Assn., Inc.*
v. *Freedom of Information Commission,* 227 Conn.
848, 852–57, 633 A.2d 305 (1993); *Ambroise* v. *William
Raveis Real Estate, Inc.,* 226 Conn. 757, 764, 628 A.2d
1303 (1993); *Texaco Refining & Marketing Co.* v. *Com-
missioner of Revenue Services,* 202 Conn. 583, 589, 522
A.2d 771 (1987). This analytical model posits that the
legislative process is purposive, and that the meaning
of legislative language (indeed, of any particular use of
our language) is best understood by viewing not only
the language at issue, but by its context and by the
purpose or purposes behind its use."

Since then, we have not been consistent in our formu-
lation of the appropriate method of interpreting statu-
tory language. At times, we have adhered to the
formulation that requires identification of some degree
of ambiguity in that language before consulting any

sources of its meaning beyond the statutory text. See, e.g., *MacDermid, Inc.* v. *Dept. of Environmental Protection*, 257 Conn. 128, 154, 778 A.2d 7 (2001) ("if the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent" [internal quotation marks omitted]). We refer herein to that formulation as the "plain meaning rule," which we discuss in further detail later in this opinion. At other times, we have, as in the present case; see part I of this opinion; adhered to a more encompassing formulation that does not require passing any threshold of ambiguity as a precondition of consulting extratextual sources of the meaning of legislative language. See, e.g., *Bender* v. *Bender*, supra, 258 Conn. 741.[20]

A

We now make explicit that our approach to the process of statutory interpretation is governed by the *Bender* formulation, as further explicated herein. The first two sentences of that formulation set forth the fundamental task of the court in engaging in the process of statutory interpretation, namely, engaging in a "reasoned search for the intention of the legislature," which we further defined as a reasoned search for "the mean-

---

[20] For purposes of both clarity and emphasis, we repeat here the *Bender* formulation: "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, [supra, 231 Conn. 431]. In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Id.; *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Services*, [supra, 231 Conn. 362]; *United Illuminating Co.* v. *Groppo*, [supra, 220 Conn. 755–56]. . . . *United Illuminating Co.* v. *New Haven*, [supra, 240 Conn. 431–32]." (Internal quotation marks omitted.) *Bender* v. *Bender*, supra, 258 Conn. 741.

ing of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply."[21] (Internal quotation marks omitted.) Id. The rest of the formulation sets forth the range of sources that we will examine in order to determine that meaning. That formulation admonishes the court to consider all relevant sources of meaning of the language at issue—namely, the words of the statute, its legislative history and the circumstances surrounding its enactment, the legislative policy it was designed to implement, and its relationship to existing legislation and to common-law principles governing the same general subject matter. Id. We also now make explicit that we ordinarily will consider all of those sources beyond the language itself,[22] without first having to cross any threshold of ambiguity of the language.

We emphasize, moreover, that the language of the statute is the most important factor to be considered, for three very fundamental reasons. First, the language of the statute is what the legislature enacted and the governor signed. It is, therefore, the law. Second, the

[21] We need not enter a semiotic debate with the dissent about whether a group such as a legislature can have an "intent," as opposed to a "purpose," in enacting legislation. Both this court and courts throughout the nation have long employed the language of "legislative intent," both within and outside the confines of the plain meaning rule, without any apparent confusion about what it means. Furthermore, our own legislature has no difficulty with the notion that it can have and express an "intent." See, e.g., General Statutes § 47-210 (a) ("[i]t is the *intent* of the General Assembly that this section is remedial and does not create any new cause of action to invalidate any residential common interest community lease, but shall operate as a statutory prescription on procedural matters in actions brought on one or more causes of action existing at the time of the execution of such lease" [emphasis added]).

[22] We say "ordinarily" because, of course, in any given case not all of the extratextual sources will be relevant or available. For example, in any given case there may not be any legislative history available, or what is available may not shed any light on the question of interpretation. The same may be said of the other sources noted. In sum, we will examine those extratextual sources to the extent that they are ascertainable.

process of interpretation is, in essence, the search for the meaning *of that language* as applied to the facts of the case, including the question of whether it does apply to those facts. Third, all language has limits, in the sense that we are not free to attribute to legislative language a meaning that it simply will not bear in the usage of the English language.

Therefore—and we make this explicit as well—we always *begin* the process of interpretation with a searching examination of that language, attempting to determine the range of plausible meanings that it may have in the context in which it appears and, if possible, narrowing that range down to those that appear most plausible. Thus, the statutory language is always the starting point of the interpretive inquiry. A significant point of the *Bender* formulation, however, is that we do not end the process with the language.

The reason for this, as we stated in *Frillici*, is that "the legislative process is purposive, and . . . the meaning of legislative language (indeed, of any particular use of our language) is best understood by viewing not only the language at issue, but by its context[23] and

[23] We do not think that there is any reasonable dispute about the proposition that the meaning of language depends on its context. See, e.g., *Grayned* v. *Rockford*, 408 U.S. 104, 110, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) ("condemned to the use of words, we can never expect mathematical certainty from our language"); *Towne* v. *Eisner*, 245 U.S. 418, 425, 38 S. Ct. 158, 62 L. Ed. 2d 372 (1918) ("a word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used"); *National Labor Relations Board* v. *Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) ("[w]ords are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used, of which the relation between the speaker and the hearer is perhaps the most important part"); F. Frankfurter, "Some Reflections on the Reading of Statutes," 47 Colum. L. Rev. 527, 528 (1947) ("[J]udicial construction ought not to be torn from its wider, non-legal context. Anything that is written may present a problem of meaning, and that is the essence of the business of judges in construing legislation. The problem derives from the very nature of words. They are symbols of meaning.

by the purpose or purposes behind its use." *Frillici* v. *Westport*, supra, 231 Conn. 430–31 n.15; see also *Conway* v. *Wilton*, 238 Conn. 653, 680 A.2d 242 (1996) (interpreting General Statutes § 52-557f in light of purpose to encourage private landowners to make land available for recreational use); *Genovese* v. *Gallo Wine Merchants, Inc.*, 226 Conn. 475, 628 A.2d 946 (1993) (interpreting General Statutes § 31-51bb in light of purpose to overrule *Kolenberg* v. *Board of Education*, 206 Conn. 113, 536 A.2d 577, cert. denied, 487 U.S. 1236, 108 S. Ct. 2903, 101 L. Ed. 2d 935 [1988]).

Thus, the purpose or purposes of the legislation, and the context of that legislative language, which includes the other sources noted in *Bender*, are directly relevant to its meaning as applied to the facts of the case before us. See L. Fuller, "Positivism and Fidelity to Law—A Reply to Professor Hart," 71 Harv. L. Rev. 630, 664 (1958) (it is not "possible to interpret a word in a statute without knowing the aim of the statute"); S. Breyer, "On the Uses of Legislative History in Interpreting Statutes," 65 S. Cal. L. Rev. 845, 853 (1992) ("[a] court often needs to know the purpose a particular statutory word or phrase serves within the broader context of a statutory scheme in order to decide properly whether a particular circumstance falls within the scope of that word or phrase"); F. Frankfurter, "Some Reflections on the Reading of Statutes," 47 Colum. L. Rev. 527, 538–39 (1947) ("Legislation has an aim; it seeks to obviate some mischief, to supply an inadequacy, to effect a change of policy, to formulate a plan of government. That aim, that policy is not drawn, like nitrogen, out of the air; it is evinced in the language of the statute, as read in the light of other external manifestations of purpose.").

But unlike mathematical symbols, the phrasing of a document, especially a complicated enactment, seldom attains more than approximate precision."); F. Frankfurter, supra, 537 (process of statutory construction requires consideration of "*[t]he context*—[because] [l]egislation is a form of literary composition" [emphasis in original]).

Indeed, in our view, the concept of the context of statutory language should be broadly understood. That is, the context of statutory language necessarily includes the other language used in the statute or statutory scheme at issue, the language used in other relevant statutes, the general subject matter of the legislation at issue, the history or genealogy of the statute, as well as the other, extratextual sources identified by the *Bender* formulation. All of these sources, textual as well as contextual, are to be considered, along with the purpose or purposes of the legislation, in determining the meaning of the language of the statute as applied to the facts of the case.

## B

This brings us to a discussion of what is commonly known as the "plain meaning rule." Although we have used many different formulations of the plain meaning rule, all of them have in common the fundamental premise, stated generally, that, where the statutory language is plain and unambiguous, the court must stop its interpretive process with that language; there is in such a case no room for interpretation; and, therefore, in such a case, the court must not go beyond that language.[24]

---

[24] We note, in this connection, that we have not been consistent in our formulation of the plain meaning rule. Compare *Sanzone* v. *Board of Police Commissioners*, supra, 219 Conn. 187–88, with *State* v. *Cain*, 223 Conn. 731, 744–45, 613 A.2d 804 (1992).

In *Sanzone*, we began with the statement that, if the statutory "language is plain and unambiguous, we go no further." *Sanzone* v. *Board of Police Commissioners*, supra, 219 Conn. 187. We then set up a multistep process, as follows. If the statute is ambiguous, defined as either opaque or susceptible to different meanings, we would seek guidance from " 'extrinsic aids,' " such as the legislative history. Id. If that history, and the legislative purpose are ambiguous, we would then resort to " 'intrinsic aids,' " such as the rules of statutory construction. Id. We then stated that, in that case, because both the language and legislative history were ambiguous, we would "seek guidance . . . *from the traditional rules of English grammar* and of statutory construction." (Emphasis added.) Id., 189. Indeed, one would have thought that resort to the traditional rules of English grammar would have been near, at least, to the starting point of the interpretive process, rather than

It is useful to note that both the plain meaning rule and the *Bender* formulation have, as a general matter, their starting points in common: both begin by acknowledging that the task of the court is to ascertain the intent of the legislature in using the language that it chose to use, so as to determine its meaning in the

at the end.

In *Cain*, we employed a different, multistep version of the plain meaning principle. We began with the statement, similar to that articulated in *Sanzone*, that "[i]f a statute is clear and unambiguous, there is no room for statutory construction." *State* v. *Cain*, supra, 223 Conn. 744. We then qualified this statement with the proviso that this rule, requiring only application of the language to the facts of the case and prohibiting resort to other aids, "only applies . . . where the language is *absolutely* clear and unambiguous" and where there is no ambiguity disclosed by reference to those facts. (Emphasis in original.) Id. Furthermore, we stated, even if the language was clear on its face, resort to extratextual sources would be appropriate to determine legislative intent "if a literal interpretation . . . would lead to unworkable results . . . ." Id.

The dissent proposes a different multistep formulation of the plain meaning rule. Under that formulation, the first step is to look only at the language and, if it is plain and unambiguous, to stop there, unless that analysis produces an absurd result. If that analysis does not produce a plain and unambiguous meaning, or if it produces an absurd result, the court then, and only then, proceeds to the second step. The second step is to "eliminate all possible interpretations that render the statutory scheme incoherent or inconsistent." If that step produces more than one reasonable interpretation, the court then proceeds to the third step. The third step is to consider the statute's relationship to other legislation and relevant common-law principles, and to eliminate any interpretations incompatible with that legislation and those principles. If, after that step is performed, ambiguity still remains, the court proceeds to the fourth step. The fourth step is to examine the legislative history of the statute and the circumstances surrounding its enactment. If, after that step is performed, an ambiguity remains, the court proceeds to the fifth step. The fifth step is to "apply any applicable presumptions in reaching a final interpretation."

We note, in connection with all of these formulations, that a rigid threshold-passing requirement as a route to determining the meaning of statutory language is simply counter to any ordinary way of determining the meaning of language. We know of no other instance in which the reader of a written text undertakes, or is required to undertake, such a multistep, threshold-passing analysis in order to determine the meaning of the text. We see no persuasive reason why legislative language should be regarded as unique in this respect.

context of the case. See, e.g., *Sanzone* v. *Board of Police Commissioners*, supra, 219 Conn. 186 ("[o]ur task is to find the expressed intent of the legislature"). Where these approaches differ, however, is on how to go about that task.

Unlike the *Bender* formulation, under the plain meaning rule, there are certain cases in which that task must, as a matter of law, end with the statutory language. Thus, it is necessary to state precisely what the plain meaning rule means.

The plain meaning rule means that in a certain category of cases—namely, those in which the court first determines that the language at issue is plain and unambiguous—the court is *precluded as a matter of law* from going beyond the text of that language to consider any extratextual evidence of the meaning of that language, no matter how persuasive that evidence might be. Indeed, the rule even precludes reference to that evidence where that evidence, if consulted, would *support or confirm* that plain meaning. Furthermore, inherent in the plain meaning rule is the admonition that the courts are to seek the objective meaning of the language used by the legislature "not in what [the legislature] meant to say, but in [the meaning of] what it did say." (Internal quotation marks omitted.) Id., 187.[25] Another inherent part of the plain meaning rule is the exception that the plain and unambiguous meaning is *not* to be applied if it would produce an unworkable or absurd result. See, e.g., *State* v. *Cain*, supra, 223 Conn. 744

---

[25] There are, however, directly contradictory statements about this method of approach in our jurisprudence. In *Doe* v. *Institute of Living, Inc.*, 175 Conn. 49, 57, 392 A.2d 491 (1978), for example, we stated: "Legislative intent is to be found *not in what the legislature meant to say, but in the meaning of what it did say*." (Emphasis added.) In that same case, however, we also stated: "Indeed, [t]he particular inquiry is *not what is the abstract force of the words or what they may comprehend, but in what sense were they intended to be understood* or what understanding do they convey as used in the particular act." (Emphasis added; internal quotation marks omitted.) Id.

(unworkable result); *State* v. *DeFrancesco*, 235 Conn. 426, 437, 668 A.2d 348 (1995) (absurd result).[26]

Thus, the plain meaning rule, at least as most commonly articulated in our jurisprudence, may be restated as follows: If the language of the statute is plain and unambiguous, and if the result yielded by that plain and unambiguous meaning is not absurd or unworkable, the court must not *interpret* the language (i.e., there is no room for construction); instead, the court's sole task is to apply that language literally to the facts of the case, and it is precluded as a matter of law from consulting any extratextual sources regarding the meaning of the language at issue. Furthermore, in deciding whether the language is plain and unambiguous, the court is confined to what may be regarded as the objective meaning of the language used by the legislature, and may not inquire into what the legislature may have intended the language to mean—that is, it may not inquire into the purpose or purposes for which the legislature used the language. Finally, the plain meaning rule sets forth a set of thresholds of ambiguity or uncertainty, and the court must surmount each of those thresholds in order to consult additional sources of meaning of the language of the statute. Thus, whatever may lie beyond any of those thresholds may in any given case be barred from consideration by the court, irrespective of its ultimate usefulness in ascertaining the meaning of the statutory language at issue.[27]

[26] Although we have not confronted it in our jurisprudence, another commonly recognized exception to the plain meaning rule is that the rule will not be applied where resort to the legislative history discloses a drafting error in the statutory language as enacted. See, e.g., S. Breyer, supra, 65 S. Cal. L. Rev. 850–51, discussing *United States* v. *Falvey*, 676 F.2d 871 (1st Cir. 1982). This exception demonstrates a fundamental flaw in the dissent's methodology. If the court is precluded from examining legislative history where the statute appears unambiguous, it will not discover such a drafting error.

[27] Under the dissent's formulation of the plain meaning rule, for example, there are four thresholds of ambiguity that must be surmounted in order to render a final interpretation of the language at issue; see footnote 24 of

We now make explicit what is implicit in what we have already said: in performing the process of statutory interpretation, we do not follow the plain meaning rule in whatever formulation it may appear. We disagree with the plain meaning rule as a useful rubric for the process of statutory interpretation for several reasons.

First, the rule is fundamentally inconsistent with the purposive and contextual nature of legislative language. Legislative language *is* purposive and contextual, and its meaning simply cannot be divorced from the purpose or purposes for which it was used and from its context. Put another way, it *does* matter, in determining that meaning, what purpose or purposes the legislature had in employing the language; it *does* matter what meaning the legislature intended the language to have.

Second, the plain meaning rule is inherently self-contradictory. It is a misnomer to say, as the plain meaning rule says, that, if the language is plain and unambiguous, there is no room for interpretation, because application of the statutory language to the facts of the case *is interpretation* of that language. In such a case, the task of interpretation may be a simple matter, but that does not mean that no interpretation is required.

The plain meaning rule is inherently self-contradictory in another way. That part of the rule that excepts from its application cases in which the plain language would yield an absurd or unworkable result is implicitly, but necessarily, premised on the process of going beyond the text of the statute to the legislature's intent in writing that text. This is because the only plausible reason for that part of the rule is that the legislature could not have intended for its language to have a meaning that yielded such a result. Indeed, we have explicitly acknowledged as much. See, e.g., *State* v. *DeFrancesco*,

this opinion; and, as a result, a failure to pass any of those thresholds would bar consideration of any evidence of meaning that would lie beyond it.

supra, 235 Conn. 437 ("[i]t is also a rule of statutory construction that those who promulgate statutes or rules do not intend to promulgate statutes or rules that lead to absurd consequences or bizarre results"); *State v. Delafose*, 185 Conn. 517, 523, 441 A.2d 158 (1981) ("[t]his is the bizarre result of a literal construction of the statute not contemplated by the legislature"). Thus, application of this aspect of the plain meaning rule requires an implicit inquiry into the legislature's intent or purpose, beyond the bare text, thus, in effect, permitting the court to *rule out* the plain meaning of the language because that meaning would produce an absurd or unworkable result. We see no persuasive reason for a rule of law that prohibits a court from similarly going beyond the bare text of the statute to *rule in* a *different* meaning that other sources of meaning might suggest in any given case. Yet such a prohibition is precisely what the plain meaning rule accomplishes.

Third, application of the plain meaning rule necessarily requires the court to engage in a threshold determination of whether the language is ambiguous. This requirement, in turn, has led this court into a number of declarations that are, in our view, intellectually and linguistically dubious, and risk leaving the court open to the criticism of being result-oriented in interpreting statutes.[28] Thus, for example, we have stated that statu-

[28] As Justice Stevens of the United States Supreme Court aptly stated: "Justice Aharon Barak of the Supreme Court of Israel . . . has perceptively noted that the 'minimalist' judge 'who holds that the purpose of the statute may be learned only from its language' has more discretion than the judge 'who will seek guidance from every reliable source.' Judicial Discretion 62 (Y. Kaufmann transl. 1989). A method of statutory interpretation that is deliberately uninformed, and hence unconstrained, may produce a result that is consistent with a court's own views of how things should be, but it may also defeat the very purpose for which a provision was enacted." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 133, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001) (Stevens, J., dissenting).

We emphasize here that we do not contend that any of this court's applications of the plain meaning rule in the past, or that any current adherence

tory language does not become ambiguous "merely because the parties contend for different meanings." (Internal quotation marks omitted.) *Glastonbury Co.* v. *Gillies*, 209 Conn. 175, 180, 550 A.2d 8 (1988). Yet, if parties contend for different meanings, and each meaning is plausible, that is essentially what "ambiguity" ordinarily means in such a context in our language. See Webster's Third New International Dictionary, and Merriam-Webster's Collegiate Dictionary (10th Ed.), for the various meanings of "ambiguity" and "ambiguous" in this context. For example, in Merriam-Webster's Collegiate Dictionary, the most apt definition of "ambiguous" for this context is: "[C]apable of being understood in two or more possible senses or ways." We also have stated that, although the statutory language is clear on its face, it contains a "latent ambiguity" that is disclosed by its application to the facts of the case, or by reference to its legislative history and purpose. *Conway* v. *Wilton*, supra, 238 Conn. 664–65; see also *University of Connecticut* v. *Freedom of Information Commission*, 217 Conn. 322, 328, 585 A.2d 690 (1991) (when application of clear language to facts reveals "latent ambiguity," court turns for guidance to purpose of statute and legislative history). Statutory language, however, always requires some application to the facts of the case. Therefore, the notion of such a "latent ambiguity" as a predicate to resort to extratextual sources simply does not make sense. Moreover, we have stated that the plain meaning principle does not apply where the statutory language, although clear and unambiguous, is not "*absolutely* clear and unambiguous . . . ." (Emphasis in

to it, involves such result-oriented decision-making. Our point, drawing from Justice Stevens' remarks, is, rather, twofold: (1) attempting to follow the rule necessarily has led to dubious analytical methods and distinctions, which in turn may give the appearance of such result-oriented decision-making; and (2) the more evidence that a court consults about the meaning of legislative language, the more constrained it will be in arriving at a conclusion about that meaning.

original.) *State* v. *Cain*, supra, 223 Conn. 744. The line of demarcation between clear and unambiguous language, on one hand, and *absolutely* clear and unambiguous language, on the other hand, however, eludes us. We have stated further that the court may go beyond the literal language of the statute when "a common sense interpretation leads to an ambiguous . . . result . . . ." *State* v. *Delafose*, supra, 185 Conn. 522. It is similarly difficult to make sense of the notion of otherwise clear language becoming ambiguous because it leads to an "ambiguous . . . result . . . ." Id. Indeed, within the very same case: (1) we have stated that the language of the statute is clear and unambiguous and, therefore, "is not subject to construction"; *University of Connecticut* v. *Freedom of Information Commission*, supra, 328; and (2) nonetheless, "we *construe[d]*" the statute so as to avoid a particular result that one of the parties had pointed out would otherwise come within that plain language. (Emphasis added.) Id., 329. Thus, in that case, in applying the plain meaning rule, we directly violated it. We see little value in a rule of law that has led this court into such dubious distinctions.[29]

Eschewing the plain meaning rule does not mean, however, that we will not in any given case follow what may be regarded as the plain meaning of the language.[30]

[29] It is not the intention of the author of this majority opinion to avoid the charge of engaging in dubious distinctions and statements, since it should be noted that, with the exceptions of *Glastonbury Co.* v. *Gillies*, supra, 209 Conn. 175, and *State* v. *Delafose*, supra, 185 Conn. 517, the author either participated in or authored the opinions referred to in part II B of this opinion.

[30] It is important in this connection to define what we mean in this context by the phrase, "what may be regarded as the plain meaning of the language." By that phrase we mean the meaning that is so strongly indicated or suggested by the language as applied to the facts of the case, without consideration, however, of its purpose or the other, extratextual sources of meaning contained in the *Bender* formulation, that, when the language is read as so applied, it appears to be *the* meaning and appears to preclude any other likely meaning.

In the present case, we do not regard the defendant's proposed interpretation of the language of the capital felony statute as meeting this standard. In part I of this opinion, we describe that interpretation as "probably car-

Indeed, in most cases, that meaning will, once the extra-textual sources of meaning contained in the *Bender* formulation *are* considered, prove to be the legislatively intended meaning of the language. See, e.g., *Glaston-bury Volunteer Ambulance Assn., Inc.* v. *Freedom of Information Commission*, supra, 227 Conn. 853–54 (plain language meaning confirmed by legislative history).

There are cases, however, in which the extratextual sources will indicate a different meaning strongly enough to lead the court to conclude that the legislature intended the language to have that different meaning. See, e.g., *Lisee* v. *Commission on Human Rights & Opportunities*, 258 Conn. 529, 539, 782 A.2d 670 (2001) (statutory reference to "section" intended to mean "subsection"); *Conway* v. *Wilton*, supra, 238 Conn. 664–65 (statutory reference to "owner" does not include municipality). Importantly, and consistent with our admonition that the statutory language is the most important factor in this analysis, in applying the *Bender* formulation, we necessarily employ a kind of sliding scale: the more strongly the bare text of the language suggests a particular meaning, the more persuasive the extratextual sources will have to be in order for us to conclude that the legislature intended a different meaning.[31] See, e.g., *Schiano* v. *Bliss Exterminating Co.*, 260 Conn. 21, 45, 792 A.2d 835 (2002) (concluding extratextual

r[ying] more weight than that of the state," and as "linguistically appealing," and we also refer to "the language of the statute, viewed literally and in *isolation, [as] suggest[ing] a conclusion consistent with*" the defendant's interpretation. That is not the same, however, as appearing to be *the* meaning and appearing to preclude any other likely meaning. Indeed, it is difficult to see how the language at issue in this case could be regarded as plain and unambiguous in any realistic sense, given that it has produced three different but plausible interpretations. These three interpretations are that of: (1) the defendant and the trial court; (2) the state and the majority; and (3) the dissent.

[31] Alaska has adopted a similar sliding scale approach. See *Wold* v. *Progressive Preferred Ins. Co.*, 52 P.3d 155, 161 (Alaska 2002).

sources provided "compelling evidence" that plain meaning of statute was contrary to legislative intent). Such a sliding scale, however, is easier to state than to apply. In any given case, it necessarily will come down to a judgmental weighing of all of the evidence bearing on the question.

The point of the *Bender* formulation, however, is that it requires the court, in *all* cases, to consider *all* of the relevant evidence bearing on the meaning of the language at issue. Thus, *Bender*'s underlying premise is that, the more such evidence the court considers, the more likely it is that the court will arrive at a proper conclusion regarding that meaning.

Moreover, despite the fact that, as we noted at the outset of this discussion, no other jurisdiction specifically has adopted the particular formulation for statutory interpretation that we now adopt, there is really nothing startlingly new about its core, namely, the idea that the court may look for the meaning of otherwise clear statutory language beyond its literal meaning, even when that meaning would not yield an absurd or unworkable result. It stretches back to the sixteenth century; see, e.g., *Heydon's Case*, 3 Co. Rep. 7a, Eng. Rep. (1584); to the early days of the last century; see *Bridgeman* v. *Derby*, 104 Conn. 1, 8–9, 132 A. 25 (1926) ("As we seek to interpret this provision of [the] defendant's charter, it will be well to keep before us some of the fundamental principles of statutory construction. The intent of the lawmakers is the soul of the statute, and the search for this intent we have held to be the guiding star of the court. It must prevail over the literal sense and the precise letter of the language of the statute. *Brown's Appeal*, 72 Conn. 148, 150, 44 Atl. 22 [1899]; *Stapleberg* v. *Stapleberg*, 77 Conn. 31, 35, 58 Atl. 233 [1904]; *Wetherell* v. *Hollister*, 73 Conn. 622, 625, 48 Atl. 826 [1901]. When one construction leads to public mischief which another construction will avoid, the latter is

to be favored unless the terms of the statute absolutely forbid. Sutherland on Statutory Construction [Ed. 1891] § 323; *Balch* v. *Chaffee,* 73 Conn. 318, 320, 47 Atl. 327 [1900]. 'A statute should be construed, having in view the nature and reason of the remedy and the object of the statute, in order to give effect to the legislative intent.' *Newton's Appeal,* 84 Conn. 234, 241, 79 Atl. 742 [1911]."); and forward to the present. See *Train* v. *Colorado Public Interest Research Group,* 426 U.S. 1, 10, 96 S. Ct. 1938, 48 L. Ed. 2d 434 (1976) ("When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination. *United States* v. *American Trucking Assns., [Inc.],* 310 U.S. 534, [543–44, 60 S. Ct. 1059, 84 L. Ed. 1345] (1940) . . . . See *Cass* v. *United States,* 417 U.S. 72, 77–79 [94 S. Ct. 2167, 40 L. Ed. 2d 668] (1974). See generally Murphy, Old Maxims Never Die: The 'Plain-Meaning Rule' and Statutory Interpretation in the 'Modern' Federal Courts, 75 Col[um]. L. Rev. 1299 [1975]." [Internal quotation marks omitted.]); *United States* v. *American Trucking Assns., Inc.,* supra, 543–44 ("Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' "); *State* v. *Ellis,* 197 Conn. 436, 445, 497 A.2d 974 (1985) ("This court does not interpret statutes in a vacuum, nor does it refuse to consider matters of known historical fact. When aid to the meaning of a statute is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination." [Internal quotation marks omitted.]).

In summary, we now restate the process by which we interpret statutes as follows: "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, [supra, 231 Conn. 431]. In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Bender* v. *Bender*, supra, 258 Conn. 741. Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule.

In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered. In doing so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible. We do not, however, end with the language. We recognize, further, that the purpose or purposes of the legislation, and the context of the language, broadly understood, are directly relevant to the meaning of the language of the statute.

This does not mean, however, that we will not, in a given case, follow what may be regarded as the plain meaning of the language, namely, the meaning that, when the language is considered without reference to any extratextual sources of its meaning, appears to be *the* meaning and that appears to preclude any other likely meaning. In such a case, the more strongly the

bare text supports such a meaning, the more persuasive the extratextual sources of meaning will have to be in order to yield a different meaning.

Before concluding this discussion, we respond to several of the main points of the dissent. The dissent takes issue with both the appropriateness and the reliability of ascertaining the purpose or purposes of the statute under consideration in determining its meaning. This point demonstrates a fundamental difference between our view and the dissent's view of the nature of legislation. We think that legislation is inherently purposive and that, therefore, it is not only appropriate, but necessary to consider the purpose or purposes of legislation in order to determine its meaning. Furthermore, the experience of this court demonstrates no particular difficulty in reliably ascertaining such purposes, based not on our own personal preferences but on both textual and extratextual sources. For example, in *State* v. *Albert*, 252 Conn. 795, 804, 750 A.2d 1037 (2000), we ascertained from the text of the statute itself that the purpose of the statutory language was to incorporate a certain common-law doctrine. We stated: "[T]he legislature, in using the phrase '[p]enetration, however slight,' evinced an intent to incorporate, into our statutory law, the common-law least penetration doctrine." Id. In *Conway* v. *Hilton*, supra, 238 Conn. 664–65, we ascertained, from various extratextual sources, including reports accompanying the model act on which the statute was based, the legislative history of the statute and the surrounding legislation, that the purpose of the statute was to address certain social problems by encouraging private landowners to dedicate their land to recreational uses. In *Genovese* v. *Gallo Wine Merchants, Inc.*, supra, 226 Conn. 481–82, we ascertained from the legislative history that the purposes of the statute involved were to overrule a prior decision of this

court and to adopt the reasoning of certain decisions of the United States Supreme Court.

The dissent also suggests that judges, by employing a purposive approach to statutory interpretation rather than the plain meaning rule, will substitute our own notions of wise and intelligent policy for the policy of the legislature. We agree that this may happen; any court *may* be intellectually dishonest in performing *any* judicial task, whether it be interpreting a statute or adjudicating a dispute involving only the common law. We suggest, however, that the risk of intellectual dishonesty is just as great, or as minimal, in employing the plain meaning rule as in employing the method of interpretation that we articulate. If a court is determined to be intellectually dishonest and reach the result that it *wants* the statute to mandate, rather than the result that an honest and objective appraisal of its meaning would yield, it will find a way to do so under any articulated rubric of statutory interpretation. Furthermore, by insisting that *all* evidence of meaning be considered and explained before the court arrives at the meaning of a statute, we think that the risk of intellectual dishonesty in performing that task will be minimized. Indeed, resort to and explanation of extratextual sources may provide a certain transparency to the court's analytical and interpretive process that could be lacking under the employment of the plain meaning rule. In sum, we have confidence in the ability of this court to ascertain, explain and apply the purpose or purposes of a statute in an intellectually honest manner.

The dissent also contends that the plain meaning rule is based on the constitutional doctrine of the separation of powers. Our only response to this assertion is that there is simply no basis for it. In our view, contrary to that of the dissent, there is nothing in either the federal or the Connecticut constitutional doctrine of the separation of powers that compels *any* particular method or

rubric of statutory interpretation, that precludes a court from employing a purposive and contextual method of interpreting statutes, or that compels the judiciary to employ the plain meaning rule, in performing its judicial task of interpreting the meaning of legislative language. Simply put, the task of the legislative branch is to draft and enact statutes, and the task of the judicial branch is to interpret and apply them in the context of specific cases. The constitution says nothing about what type of language the legislature must employ in performing its tasks, and nothing about what method or methods the judiciary must employ in ascertaining the meaning of that language.[32]

The dissent also makes the points that legislative history should be considered only if "the other tools of interpretation fail to produce a single, reasonable meaning," and that, in any event, it is an unreliable method of ascertaining legislative intent and facilitates " 'decisions that are based upon the courts' policy preferences, rather than neutral principles of law.' " See A. Scalia, A Matter of Interpretation: Federal Courts and the Law (A. Gutmann ed., 1997) p. 35. Thus, the dissent regards the use of legislative history as unreliable evi-

---

[32] In this connection, we also reject the dissent's suggestion that, by employing the plain meaning rule, we will give the legislature an incentive to write clear statutes and, presumably, therefore, also give it a disincentive to write poorly drafted statutes. We do not regard it as appropriate for the judiciary, by creating incentives or disincentives, to instruct the legislature on how to write statutes, any more than it would be appropriate for the legislature, directly or indirectly, to instruct the judiciary on how to write opinions. We presume that the legislature, within the constraints of time and other resources, does the best it can in attempting to capture in legislative language what it is attempting to accomplish by its legislation. No legislature, or legislative drafter, has the ability to foresee all of the questions that may arise under the language that it employs. Our task is to do the best we can in interpreting its language, within the context of specific factual situations presented by specific cases and within the limits of that language, so as to make sense of the statute before us and so as to carry out the legislature's purpose or purposes in enacting that statute.

dence of legislative intent, and as insidious in the sense that it permits the court to interpret a statute to reach a meaning that the court *wants* it to have, based on the court's own policy preference, rather than that of the legislature. As a result, in the dissent's five step formulation of the plain meaning rule, consideration of legislative history is relegated to the fourth, or penultimate, step.

In response, we note first that it is difficult to understand why the dissent would consider the use of legislative history at all in its formulation, given that it regards such use as both unreliable and insidious. More importantly, it appears to us that, under the dissent's formulation, only the most difficult cases of statutory interpretation would reach the fourth step of its analysis. Thus, the dissent reserves what it regards as an unreliable and insidious source of statutory meaning to act as the tiebreaker in the most difficult cases of interpretation. This strikes us as a curiously important role for what the dissent regards so negatively as a source of the meaning of legislative language.

On the merits of the use of legislative history, we simply disagree with the dissent's characterizations of it. The general experience of this court demonstrates to us that legislative history, when reviewed and employed in a responsible, discriminating and intellectually honest manner, can constitute reliable evidence of legislative intent. See, e.g., *Genovese* v. *Gallo Wine Merchants, Inc.*, supra, 226 Conn. 481–82; *Wright Bros. Builders, Inc.* v. *Dowling*, 247 Conn. 218, 230–31, 720 A.2d 235 (1998) (legislative history of General Statutes § 20-429 indicated that "technically perfect compliance with each subdivision" is not required); *Seal Audio, Inc.* v. *Bozak, Inc.*, 199 Conn. 496, 512, 508 A.2d 415 (1986) (legislative history of General Statutes § 52-434 indicated that legislature did not intend appointment of attorney trial referees without consent of parties).

In addition to legislative hearings and debate, legislative history includes official commentary to various statutory codifications, such as our Penal Code and title 42a of the General Statutes, which is Connecticut's version of the Uniform Commercial Code. We routinely have cited these commentaries as reliable evidence of legislative intent. See, e.g., *Washington* v. *Meachum*, 238 Conn. 692, 711, 680 A.2d 262 (1996) (official commentary to Penal Code suggested that eavesdropping statutes were not intended to penalize nonconsensual monitoring and recording of communication if at least one party to communication is aware of monitoring and recording); *Flagg Energy Development Corp.* v. *General Motors Corp.*, 244 Conn. 126, 136–39, 709 A.2d 1075 (1998) (applying official comment 1 to § 42a-2-503 of the Uniform Commercial Code). Still another aspect of the legislative history of a statute is its genealogy, which is its historical development over time. We often have found consideration of a statute's genealogy useful in determining its meaning, as applied in the case before us, and have been able to do so without substituting our own view of its policy for that of the legislature. See, e.g., *Southington* v. *Commercial Union Ins. Co.*, 254 Conn. 348, 362–63, 757 A.2d 549 (2000) (genealogy of General Statutes § 8-26c [c] regarding discretionary authority of municipality to call subdivision performance bond); *Doe* v. *Doe*, 244 Conn. 403, 424–27, 710 A.2d 1297 (1998) (genealogy of use of term "child of the marriage" in marital dissolution statute).

As for the insidious nature of the use of such history, our response is the same as that we made to the same argument of the dissent regarding the general aim of ascertaining the purpose of a statute. If a court is determined to be intellectually dishonest and result-oriented in its decision-making, it does not need any particular stated rubric of interpretation—whether purposive, plain meaning, or some other method—to be so. Fur-

thermore, we have confidence in this court's ability to employ legislative history in a responsible, discriminating and intellectually honest manner, so as to determine the legislature's purpose or purposes, and not our own. We think that our history in doing so bears this out, and we are confident that we can continue to do so.

Ultimately, as Justice Cardozo acknowledged, the process of statutory interpretation requires "a choice between uncertainties. We must be content to choose the lesser." *Burnett* v. *Guggenheim*, 288 U.S. 280, 288, 53 S. Ct. 369, 77 L. Ed. 748 (1933). Furthermore, as Justice Frankfurter stated, in making those choices we cannot avoid "the anguish of judgment." F. Frankfurter, supra, 47 Colum. L. Rev. 544. The *Bender* formulation recognizes these realities.

The ruling of the trial court requiring the state to prove that both murders were committed in the aggravated manner is reversed and the case is remanded for further proceedings according to law.

In this opinion NORCOTT, PALMER and VERTEFEUILLE, Js., concurred.

NORCOTT, J., concurring. I agree with the well reasoned majority opinion and endorse unequivocally the approach to the statutory interpretation articulated in part II of that opinion. I write separately, however, to emphasize that I am only able to join the majority because of the procedural posture of, and narrow issue presented by, this case, under which the General Statutes § 53a-46a penalty phase hearing has not yet occurred. Accordingly, imposition of the death penalty, a sentence that I have long felt "cannot withstand constitutional scrutiny because it allows for arbitrariness and racial discrimination in the determination of who shall live or die at the hands of the state"; *State* v. *Cobb*, 251 Conn. 285, 543, 743 A.2d 1 (1999) (*Norcott, J.*, dissenting), cert. denied, 531 U.S. 841, 121 S. Ct. 106,

148 L. Ed. 2d 64 (2000); will not necessarily follow as a direct consequence of our decision in the present case.

Indeed, I emphasize that my previously expressed position concerning the imposition of the death penalty in Connecticut remains steadfast and unwavering. See, e.g., id.; *State* v. *Webb*, 238 Conn. 389, 566, 680 A.2d 147 (1996) (*Norcott, J.*, dissenting). The present case, however, merely presents a preliminary issue of statutory construction and does not, therefore, require us to delve into the grave constitutional concerns that form the predicate for my opposition to capital punishment. Should the situation so warrant, however, this court will hear the defendant's more general challenges to the imposition of the death penalty after the penalty phase hearing, if and when such challenges are brought.

KATZ, J., concurring and dissenting. I maintain my belief that the death penalty fails to comport with contemporary standards of decency and thereby violates our state constitution's prohibition against cruel and unusual punishment. See Conn. Const., art. I, §§ 8 and 9. Nevertheless, I concur in the judgment reached by the majority because I have an obligation, consistent with my oath and responsibilities as a justice of this court, to decide the issue before the court, despite the fact that, by agreeing with the majority on the merits, I thereby enable the state to proceed with a penalty phase hearing, pursuant to General Statutes (Rev. to 1997) § 53a-46a, under a diminished burden of proof.[1] I appreciate the tension that exists between my belief regarding the death penalty and my resolution of the issue on appeal. I am mindful, however, that because

---

[1] I recognize, however, that because four other members of this court also agree with the state's interpretation of the revision of General Statutes § 53a-54b (8) in effect at the time of the commission of the crimes here; see footnote 2 of this concurring and dissenting opinion; the majority's ability to persuade me to concur in the judgment in the present case provides a hollow victory.

of the unique posture of this case, other challenges by the defendant to the application of the death penalty may arise and, accordingly, can be addressed at another time, if and when those issues become pertinent.

The defendant claims that, when a person is convicted of a capital felony for the murder of two or more persons in violation of General Statutes (Rev. to 1997) § 53a-54b (8), as amended by No. 98-126, § 1, of the 1998 Public Acts (P.A. 98-126),[2] the state must prove that at least two of those victims died in an especially heinous, cruel or depraved manner in order to satisfy the requisite aggravating factor set forth in General

[2] General Statutes (Rev. to 1997) § 53a-54b, as amended by P.A. 98-126, provides: "A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the Division of State Police within the Department of Public Safety or of any local police department, a chief inspector or inspector in the Division of Criminal Justice, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, an employee of the Department of Correction or a person providing services on behalf of said department when such employee or person is acting within the scope of his employment or duties in a correctional institution or facility and the actor is confined in such institution or facility, or any fireman, while such victim was acting within the scope of his duties; (2) murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain; (3) murder committed by one who has previously been convicted of intentional murder or of murder committed in the course of commission of a felony; (4) murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment; (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) the illegal sale, for economic gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone; (7) murder committed in the course of the commission of sexual assault in the first degree; *(8) murder of two or more persons at the same time or in the course of a single transaction;* or (9) murder of a person under sixteen years of age." (Emphasis added.)

Section 53a-54b subsequently has been amended, resulting in the elimination of then subdivision (6) relating to the death of a person as a result of the illegal sale of drugs. See Public Acts 2001, No. 01-151, § 3. References herein to § 53a-54b are to the 1997 revision, as amended by P.A. 98-126.

Statutes § 53a-46a (i) (4) to allow the imposition of the death penalty ([i] [4] aggravating factor).[3] The defendant advances several arguments in support of his position. Although these arguments have superficial appeal, I, like the majority, reject them. I agree with the majority's determination of the process by which we interpret statutes; see part II of the majority opinion; and likewise conclude that proof that the defendant committed at least one of the murders in the specified aggravated manner satisfies the requirements of § 53a-46a (i) (4).

At the time of the commission of the crimes here, § 53a-54b (8) defined a capital felony as the "murder of two or more persons at the same time or in the course of a single transaction . . . ." See footnote 2 of this concurring and dissenting opinion. The defendant claims that the rules of statutory construction and lenity compel the conclusion that the state must prove the aggravating factor with respect to at least two victims. In support of this position, the defendant relies on the plain language of the § 53a-54b (8) itself, the overall statutory scheme and the policy behind both.

The defendant first contends that the plain language of § 53a-54b (8), namely, the phrases "two or more persons" and "at the same time or in the course of a single transaction," supports his interpretation of that provision's meaning. Specifically, he claims that the "essential gravamen" of the offense set forth in that subdivision, to which the (i) (4) aggravating factor applies, is the "murder of two or more persons . . . ."

---

[3] General Statutes § 53a-46a (i) provides in relevant part: "The aggravating factors to be considered [when determining the sentence to be imposed for a capital felony] shall be limited to the following . . . (4) the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ."

While § 53a-46a has been amended since 1998, the time of the commission of the crimes in the present case; see Public Acts 2001, No. 01-151, §§ 1 and 2; subsection (i) (4) has remained unchanged. References herein to § 53a-46a (i) (4) are to the current revision of the statute.

General Statutes (Rev. to 1997) § 53a-54b (8), as amended by P.A. 98-126. The defendant contends, therefore, that the murders of a minimum of two persons, in a multiple murder scenario, must be "aggravated," or committed in an especially heinous, cruel or depraved manner, in order for the death penalty to be imposed. Moreover, he contends that the phrase "at the same time or in the course of a single transaction" in § 53a-54b (8) supports this construction. In particular, he points out that, if the legislature had intended the essential gravamen to have been only that of a multiple murder, it would have selected different phraseology to convey that meaning, for example, that it is a capital felony to commit a murder *during the commission of another murder*. Because the legislature did not do so, however, opting instead for the phrase, "at the same time or in the course of a single transaction," the defendant contends that it is not the murder of an *additional* person in the same transaction that triggers the offense provided for in § 53a-54b (8), but, rather, the murder of *at least two* people. Therefore, in the defendant's view, the underlying "offense" to which the (i) (4) aggravating factor applies is the murder of at least two people. Accordingly, because the (i) (4) aggravating factor calls for the underlying "offense" to have been committed in an especially heinous, cruel or depraved manner, the defendant concludes that at least two people must have been murdered in such a manner to support a finding that the aggravating factor exists in the commission of an offense pursuant to § 53a-54b (8).

The defendant further contends that his construction is consistent with the overall scheme of § 53a-54b. In particular, the defendant notes that each of the offenses enumerated in the nine subdivisions of that statute that was in effect at the time of the commission of the crimes here is comprised of a murder and an additional substantive element that the legislature deemed worthy

of separating out from the general murder scheme as a death eligible murder. According to the defendant, the (i) (4) aggravating factor applies to both the murder and the additional substantive element. To illustrate his contention, the defendant directs us to the eight subdivisions of the statute that are not applicable in the present case, which subdivisions establish that murder is a capital offense when: the victim is a police officer; the murder is for hire; the person who commits the murder already has been convicted either of an intentional murder or a murder in the course of committing a felony; the person who commits the murder is serving a life sentence; the murder is committed in the course of a kidnapping; the person who commits the murder sells to the victim illegal narcotics that are the direct cause of the death; the murder occurs in the course of a sexual assault; General Statutes (Rev. to 1997) § 53a-54b (1) through (7), as amended by P.A. 98-126; or the victim is under sixteen years of age. General Statutes (Rev. to 1997) § 53a-54b (9), as amended by P.A. 98-126. According to the defendant, in each of those instances, the two elements constitute the offense, and the (i) (4) aggravating factor applies to each element. Therefore, the defendant posits as an example of his interpretation that, when a person kidnaps and murders a victim, the murder *and* the kidnapping must be committed in an especially heinous, cruel or depraved manner in order to support a finding of the presence of the (i) (4) aggravating factor. The defendant contends, therefore, that, consistent with this scheme, in the present case, the murder plus the additional substantive element that the legislature deemed death eligible under § 53a-54b (8) is the murder of at least two persons. In other words, the defendant claims that, in order for the (i) (4) aggravating factor to apply to the entire offense under § 53a-54b (8), which is the murder of "two or more persons," the murders of at least two people must

have been committed in a heinous, cruel or depraved manner.

Finally, the defendant claims that his interpretation is consistent with the legislature's purpose in enacting § 53a-54b, in general, and subdivision (8), in particular. The defendant points out that the legislature enacted a very narrow capital punishment scheme by setting aside a discrete and specific number of death eligible murders, and by further narrowing the number of those murders for which a defendant actually can receive the death penalty to require that certain aggravating factors must outweigh any present mitigating factors. The defendant additionally notes that discussion surrounding the enactment of § 53a-54b (8) centered on the legislature's reaction to recent multiple murders and the role of the capital punishment scheme as a deterrent to certain kinds of murders. Reading § 53a-54b (8) such that the (i) (4) aggravating factor must apply to at least two murders, the defendant claims, furthers both of these legislative purposes: it confines the class of multiple murders that are death eligible, yet its potential as a death eligible offense dissuades individuals from committing multiple murders.

It is well established that this court eschews statutory interpretations that yield bizarre or irrational results. *Hartford* v. *Hartford Municipal Employees Assn.*, 259 Conn. 251, 274, 788 A.2d 60 (2002). While the defendant's arguments regarding the plain language of § 53a-54b (8) are, at first blush, intuitively seductive, his interpretation, in practice, would lead to bizarre results. First, with respect to his contention regarding the capital punishment scheme, the defendant's argument that each offense to which the (i) (4) aggravating factor applies is composed of two substantive elements and that the (i) (4) aggravating factor applies to both of the two elements misreads our prior case law and is inconsistent with the legislative purpose behind the

creation of, and the amendments to, the capital punishment scheme. The defendant is correct that our case law *implicitly* has applied the (i) (4) aggravating factor to both substantive elements of an offense pursuant to § 53a-54b, but only in that we never have applied it, *explicitly*, solely to one of the two elements. See, e.g., *State* v. *Ross*, 230 Conn. 183, 264, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995) (defendant could not prevail on sufficiency claim because "state presented ample evidence . . . [that] there were aggravating circumstances beyond the elements of the crimes charged"); *State* v. *Breton*, 212 Conn. 258, 265, 270, 562 A.2d 1060 (1989) (aggravating factor envisions "intentional infliction of extreme pain or torture above and beyond that necessarily accompanying the underlying killing"). It does not follow, however, that because we never *expressly* have applied the (i) (4) aggravating factor to only one of the two substantive elements, we, therefore, *necessarily* have construed the (i) (4) aggravating factor as applying to both substantive elements.

Indeed, the language of § 53a-54b itself contradicts such an application. In subdivisions (1) through (4) and (9) of § 53a-54b, which, together, constitute more than one half of the statute, the (i) (4) aggravating factor *cannot*, in practice, be applied to both substantive elements of the offense enumerated. For example, while the murder of a police officer pursuant to § 53a-54b (1) certainly can be committed in an especially heinous, cruel or depraved manner, it defies logic to construe the statute to mean that *both* substantive elements of that offense, namely, the murder *and the police officer*, were "committed . . . in an especially heinous, cruel or depraved manner . . . ." General Statutes § 53a-46a (i) (4). Likewise, both elements of a murder (element one) for hire (element two) pursuant to § 53a-54b (2)

cannot be committed in an especially heinous, cruel or depraved manner.

The defendant cites subdivisions (5) and (7) to support his contention that the statutory scheme calls for the application of the (i) (4) aggravating factor to each element of the offenses enumerated in § 53a-54b. His construction admittedly works, in theory, with respect to those subdivisions. The elements of kidnapping (element one) and murder (element two) under § 53a-54b (5) both *can* be committed in an especially heinous, cruel or depraved manner, as can the elements of sexual assault (element one) and murder (element two) under § 53a-54b (7). It does not follow, however, from the fact that, because two of the eight other subdivisions of § 53a-54b have two elements that *can* be committed in an especially heinous, cruel or depraved manner, the statutory scheme thereby should be interpreted such that the two elements in each subdivision *must* be committed in such a manner to satisfy the (i) (4) aggravating factor. Indeed, because the defendant's theory is impossible to apply with regard to six of the eight other death eligible offenses enumerated in the statute, the logical conclusion must be that the defendant's argument in this regard does not advance his claim.

Furthermore, the defendant's interpretation contradicts the apparent intent of the legislature in enacting the capital punishment scheme. The legislative history illustrates that the purpose of the legislature in enacting the capital sentencing scheme, in general, and the multiple murder amendment, in particular, was deterrence. See 23 S. Proc., Pt. 8, 1980 Sess., pp. 2312–13, remarks of Senator Salvatore C. DePiano (questioning whether life imprisonment has same deterrent value as death penalty); id., pp. 2326–27, remarks of Senator Howard T. Owens, Jr. (stating purpose of multiple murder amendment is "deterrent effect"); 23 H.R. Proc., Pt. 19, 1980 Sess., pp. 5695, 5697, remarks of Representative

Eugene A. Migliaro, Jr. (explaining, in opposition to amendment to capital punishment scheme that proposed changing sentence for capital felony from death penalty to life imprisonment, that death penalty was deterrent).

It also is rational to assume from the capital punishment scheme that the legislature considered murder to be the ultimate crime. Indeed, as the defendant points out, each offense delineated in § 53a-54b is, at base, a murder, singled out by the legislature as death eligible by virtue of the fact that an additional characteristic accompanies it, for example, kidnapping, sexual assault, a victim who is a police officer, or, as in the present case, another murder. With respect to all but subdivision (8) of § 53a-54b, therefore, the state has to prove that the (i) (4) aggravating factor applies only to one murder before a defendant can receive a death sentence. Nonetheless, according to the defendant, with respect to § 53a-54b (8), the state has to prove that the (i) (4) aggravating factor applies to at least two murders before a defendant will receive a death sentence. If the legislature viewed murder as the ultimate crime, however, and if its purpose in enacting § 53a-54b was to deter certain kinds of murders by making them death eligible, then it would have been irrational for the legislature to have intended that two aggravated murders are required before the offense is death eligible under subdivision (8), given that, under every other subdivision of § 53a-54b, one aggravated murder suffices to establish eligibility for the death penalty. Moreover, this is especially so, given that the legislature's express intent in enacting § 53a-54b (8) was to deter multiple murders.[4] It would have been irrational, in attempting

[4] Although the legislature, in debates on the statute, did not discuss explicitly the application of the (i) (4) aggravating factor to § 53a-54b (8), it did discuss expressly that the thrust of the provision was to deter multiple murders. In particular, it was noted that the multiple murder provision was included in direct response to the public outrage created following the 1979 murders that had occurred in Waterbury, during which three Purolator

to deter multiple murders, to make it more difficult for the state to establish that the offense of multiple murder is death eligible than it is for the state to establish that one murder is death eligible.

In support of his interpretation of § 53a-54b (8), the defendant also argues that this court should look to states with similar capital punishment schemes, that is, those that define multiple murder as a capital offense, not an aggravating factor, and also have a similar aggravating factor that is applied to that offense before the death penalty can be imposed. There are only two states that have such schemes: Virginia and Alabama.[5] Review of those states' application of their death penalty schemes, however, does not support the defendant's position.

Virginia's capital punishment scheme defines capital murder as the murder of "more than one person as a

Armored Car guards were ambushed in a garage and shot to death. See *State* v. *Couture*, 218 Conn. 309, 589 A.2d 343 (1991); *State* v. *Pelletier*, 209 Conn. 564, 552 A.2d 805 (1989). The murders were not punishable by death under the capital punishment scheme in effect at that time. Thus, the legislature enacted § 53a-54b (8) in an effort to deter multiple murders by making such offenses death eligible. See 23 S. Proc., supra, pp. 2326–27, remarks of Senator Owens. This express purpose is better served by a construction of § 53a-54b (8) under which only one aggravated murder is required for the imposition of the death penalty than under one in which two aggravated murders would be required.

[5] The state argues that Texas and Kansas also have such death penalty schemes. As the defendant correctly notes, however, Texas' statute provides no guidance in answering the question at hand—the application of the (i) (4) aggravating factor to the offense of multiple murder—because Texas does not have an aggravating factor analogous to the (i) (4) aggravating factor, and does not use aggravating factors to determine which capital murders are death eligible. Rather, Texas requires the sentencing authority to answer questions relating to the defendant's conduct and the likelihood of similar future conduct. See Tex. Penal Code Ann. § 19.03 (a) (7) (A) and (B) (Vernon 1994); Tex. Crim. Proc. Code Ann. art. 37.071 (Vernon 2002). Kansas' scheme also is unhelpful because, although that state's scheme is similar to Connecticut's; see Kan. Stat. Ann. §§ 21-3439 (6) and 21-4625 (6) (1995); my research has revealed no case law addressing this issue.

part of the same act or transaction"; Va. Code Ann. § 18.2-31 (7) (Michie Cum. Sup. 2002); and instructs that the death penalty "shall not be imposed unless . . . [the defendant's] conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim . . . ." Va. Code Ann. § 19.2-264.2 (Michie 2000). In *Barnes* v. *Commonwealth*, 234 Va. 130, 131–33, 360 S.E.2d 196 (1987), cert. denied, 484 U.S. 1036, 108 S. Ct. 763, 98 L. Ed. 2d 779 (1988), the defendant appealed his conviction of capital murder under § 18.2-31 (7) in connection with an attempted robbery during which he shot and killed a store owner and his employee. He claimed at oral argument before the Virginia Supreme Court that, because the capital murder charge was premised on multiple murders, *both* murders had to meet the vileness predicate of § 19.2-264.2 before the death penalty could be imposed. Id., 138. That court expressly concluded: "Where the 'vileness' predicate is under consideration, the manifest legislative purpose is to punish and deter any conduct which meets that standard. We conclude that if the killing *of any victim* in a multiple homicide meets the test of . . . § 19.2-264.2, the death penalty may be imposed." (Emphasis added.) Id.; see, e.g., *Goins* v. *Commonwealth*, 251 Va. 442, 470 S.E.2d 114, 132, cert. denied, 519 U.S. 887, 117 S. Ct. 222, 136 L. Ed. 2d 154 (1996) (implicitly affirming application of vileness factor to only one murder in conviction under multiple murder statute during review of sufficiency of evidence claim); *Thomas* v. *Commonwealth*, 244 Va. 1, 24–25, 419 S.E.2d 606 (1992) (same). Accordingly, Virginia's statutory scheme does not lend support to the defendant's claim in the present case.

Likewise, Alabama's statutory scheme does little to support the defendant's claim. Alabama's capital punishment scheme defines capital murder as "[m]urder

wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct"; Ala. Code § 13A-5-40 (a) (10) (1994); and allows the imposition of the death penalty when "[t]he capital offense was especially heinous, atrocious or cruel compared to other capital offenses." Ala. Code § 13A-5-49 (8) (1994). The Alabama courts have not addressed explicitly the issue of whether, in a multiple murder conviction under § 13A-5-40 (a) (10), the heinous factor must be found to apply to two or more murders before the death penalty can be imposed. Review of the case law in which the Alabama courts have applied the heinous factor to a capital conviction pursuant to Alabama's multiple murder provisions, however, reveals that such cases have involved the application of the heinous factor to at least two murders. See, e.g., *Acklin* v. *State*, 790 So. 2d 975, 1001 (Ala. Crim. App. 2000), cert. denied, 533 U.S. 936, 121 S. Ct. 2565, 150 L. Ed. 2d 729 (2001) (evidence that defendant beat, humiliated and tortured, then shot three victims sufficient to support finding that murders were heinous); *Norris* v. *State*, 793 So. 2d 847, 861 (Ala. Crim. App. 1999) (evidence insufficient to elevate offense to especially heinous when three victims shot in rapid, uninterrupted succession); *Wilson* v. *State*, 777 So. 2d 856, 882 (Ala. Crim. App. 1999) (evidence that "defendant was unnecessarily torturous in his commission of the crimes" sufficient to support finding that four murders were heinous); *Peoples* v. *State*, 510 So. 2d 554, 573 (Ala. Crim. App. 1986), cert. denied, 484 U.S. 933, 108 S. Ct. 307, 98 L. Ed. 2d 266 (1987) (evidence that kidnapping and murder of husband, wife and child by blunt trauma to head sufficient to support finding that three murders were heinous); *Wright* v. *State*, 494 So. 2d 726, 744 (Ala. Crim. App. 1985), aff'd sub nom. *Ex parte Wright*, 494 So. 2d 745 (Ala.), cert. denied, 479 U.S. 1101, 107 S. Ct. 1331, 94 L. Ed. 2d 183 (1987) (evi-

dence that two victims were shot in head and slowly died in pools of blood sufficient to support trial court's finding that murders were heinous). Accordingly, in the absence of any evidence indicating that the Alabama legislature's intention in enacting its particular capital sentencing scheme was to make only multiple murders in which at least two of the murders were heinous eligible for the imposition of the death penalty, the similarity of that scheme to Connecticut's carries little persuasive force in the effort to interpret our scheme in this regard.

Finally, the defendant constructs an elaborate argument based upon the differences between the language our legislature chose in enacting § 53a-54b (8), the language of the Model Penal Code and a proposed 1973 federal death penalty statute. According to the defendant, those differences reflect an intention by the legislature that the (i) (4) aggravating factor apply to at least two murders, unlike the statutory formulations called for by those sources, permitting application of the aggravant to only one of the murders. In light of the fact, however, that there is no mention of these sources in our legislative history tending to indicate that the legislature took into consideration the language used in these sources, this argument is without merit.

In conclusion, consistent with the principles of statutory construction set forth in the majority opinion, I agree with the majority that the state's interpretation is more rational and, accordingly, is the correct one. While the interpretation proffered by the defendant and endorsed by the trial court is plausible, namely, that the (i) (4) aggravating factor applies to the underlying "offense," which consists of at least two murders, and that at least two murders must, therefore, be aggravated, a careful review of the statutory language and scheme, the legislative intent, and the practical outcome of such an application reveals that such an interpreta-

tion is not rational and, as such, could not have been the legislature's intention. The defendant's strongest arguments involve the plain language of the statute and are indeed, at first blush, persuasive. But plain language is only the beginning of our statutory interpretation jurisprudence. See part II of the majority opinion. Indeed, further examination using our remaining available tools of statutory construction reveals that his arguments are hollow. Moreover, the defendant's reliance on the statutes of other states does not counter this conclusion and, in fact, Virginia's interpretation of its statutory scheme supports it. The defendant's claim is, therefore, without merit.

ZARELLA, J., with whom SULLIVAN, C. J., joins, dissenting. The majority's opinion is nothing short of breathtaking. The majority expressly abandons the plain meaning rule and fails to apply the rule of lenity in a death penalty case in which the majority states that the text of the statutory provision at issue favors the defendant's interpretation. Moreover, application of the tools of interpretation that the majority employs in reaching its conclusion leads to a flawed assessment of the rationality of the legislature's choices in drafting this state's death penalty statute. I believe, for reasons distinct from those offered by the majority, that the text of the statute at issue suggests that the defendant's interpretation of the statute should be rejected. I am not convinced, however, that the statute is clear and unambiguous, which, under well established law, is constitutionally required if this court is to reject the defendant's interpretation. Finally, in my view, the majority's abandonment of the plain meaning rule in favor of an alternative and novel method of statutory interpretation represents an incorrect deviation from our traditional mode of statutory interpretation and an impermissible usurpation of the legislative function. Accordingly, I dissent.

First, as I describe in part I of this opinion, the majority's statutory interpretation is, in reality, a series of assertions about the purported irrationality of that which the majority perceives as the probable textual meaning of the statute, i.e., that the existence of the aggravating factor enumerated in General Statutes (Rev. to 1997) § 53a-46a (i) (4) cannot be established under the circumstances of this case unless *both* murders are proven to be committed in an especially heinous, cruel or depraved manner.[1] Nevertheless, the majority holds that the statute's "context and history" reveal that the existence of the aggravating factor enumerated in § 53a-46a (i) (4) can be established upon proof that *one* of the murders was committed in a cruel manner. In my view, however, the majority's assertions regarding the statute's "context and history" are wholly unpersuasive.

Even more striking is the majority's failure to apply the rule of lenity. The rule of lenity, which embodies the fundamental constitutional principles of due process and the separation of powers; see, e.g., *United States* v. *Bass*, 404 U.S. 336, 348, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971); provides that our death penalty statute should not be applied unless the legislature "*expressly* so intend[s]." (Emphasis in original; internal quotation marks omitted.) *State* v. *Harrell*, 238 Conn. 828, 832, 681 A.2d 944 (1996), quoting *State* v. *Breton*, 212 Conn. 258, 268–69, 562 A.2d 1060 (1989). I cannot fathom how the majority can conclude that a statute, the plain meaning of which, according to the majority, *favors* the defendant's interpretation, nevertheless reveals an *express* legislative intent to impose the death penalty under the circumstances of this case. The majority's failure to adhere to the clear command of the rule of lenity under such circumstances is not only unprece-

---

[1] For ease of reference, I hereinafter refer to the phrase "especially heinous, cruel or depraved" found in § 53a-46a (i) (4) as "cruel."

dented, but startling, in view of the fact that this court expressly has concluded that the rule is "especially pertinent to a death penalty statute . . . ." (Internal quotation marks omitted.) *State* v. *Harrell*, supra, 833.

In contrast, as I describe in part II of this opinion, I would conclude that the text of § 53a-46a (i) (4) strongly suggests that the state must prove that, under the totality of the circumstances, the offense, i.e., capital felony, as a *whole*, was committed in a cruel manner. In my view, an inquiry into whether the constituent parts of the capital felony—in the present case, each of the two murders—were committed in a cruel manner simply is unnecessary under our death penalty scheme. I also would conclude, however, that a reasonable doubt persists about the statute's meaning. Specifically, although I believe that, under § 53a-46a (i) (4), the state need not prove that each murder was committed in a cruel manner in order to establish the existence of that aggravating factor, my belief is not the product of statutory language that is manifest. Therefore, I would uphold the trial court's application of the rule of lenity and hold that § 53a-46a (i) (4) requires the state to prove that each murder was committed in a cruel manner in order to establish the existence of that aggravating factor.

Finally, as I describe in part III of this opinion, I strongly disagree with the majority's unique approach to statutory interpretation. In particular, I believe that this court should continue to adhere to the plain meaning rule as it has, along with nearly every other court in this country, for the past 100 years. In my view, the problems inherent in the majority's alternative method of statutory interpretation could not be illustrated better than by the majority opinion itself. I conclude by offering an approach to statutory interpretation that I believe is more consistent with the fundamental role

that the text of a statutory provision should play in statutory interpretation.

## I

### A

As the majority notes, the defendant argues that the aggravating factor at issue requires proof that "the defendant committed *the offense* in an especially heinous, cruel or depraved manner . . . ." (Emphasis added.) General Statutes (Rev. to 1997) § 53a-46a (i) (4). Moreover, the majority states that "the likely referent of 'the offense' is the capital felony of which the defendant has been convicted . . . ." In the present case, that offense is defined as the "murder of two or more persons at the same time or in the course of a single transaction . . . ." General Statutes (Rev. to 1997) § 53a-54b (8). Thus, the defendant argues that, because the offense enumerated in § 53a-54b (8) is the murder of two persons, § 53a-46a (i) (4) requires proof that both murders were committed in a cruel manner. The majority concludes that this is the most persuasive textual reading of the statute.[2]

I would further note that the defendant's interpretation is consistent with the notion expressed in this state's appellate case law that the term "offense" refers to all, and not part, of the elements of the offense. For example, in *State* v. *Miller*, 69 Conn. App. 597, 795 A.2d 611, cert. denied, 260 Conn. 939, 802 A.2d 91 (2002), the Appellate Court recently noted that, "[t]o sustain a conviction for conspiracy to commit a particular *offense*, the prosecution must show not only that the conspirators intended to agree but also [that] they intended to commit the *elements of the offense.*" (Emphasis added; internal quotation marks omitted.)

---

[2] In her separate opinion, Justice Katz agrees with the majority's assessment in stating that "[t]he defendant's strongest arguments involve the plain language of the statute and are indeed, at first blush, persuasive."

Id., 607. Thus, the Appellate Court in *Miller* refers to the term "offense" and the phrase "elements of the offense" as identical concepts. See id. That is, one cannot be convicted of conspiracy to commit an "offense" unless one conspires to commit the "elements of the offense." (Internal quotation marks omitted.) Id. Likewise, the text of § 53a-46a (i) (4) reasonably can be construed to require the state to prove that "the defendant committed [all of the elements of] *the offense* in an especially heinous, cruel or depraved manner . . . ." (Emphasis added.) General Statutes (Rev. to 1997) § 53a-46a (i) (4).[3]

Although the majority acknowledges that the text of the statute favors the defendant's interpretation over the state's contrary textual interpretation, the majority nevertheless concludes that the statute's "context and history" support the state's interpretation. Unlike the defendant, who relies upon the similarity between the meaning of the word "offense" and the meaning of the phrase "elements of the offense" in offering his construction of § 53a-46a (i) (4), the majority relies on the statute's context and history in construing that statutory provision to require proof only that "the defendant committed [*at least part of*] the offense in an especially heinous, cruel or depraved manner . . . ." General Statutes (Rev. to 1997) § 53a-46a (i) (4). Obviously, an interpretation of a statute that is based on the insertion of words that do not appear in its text should be rejected. This is all the more true in the present case in light of the unpersuasiveness of the reasons offered by the majority in support of its implicit

[3] I would also note that our Penal Code defines the term "offense" in a manner that makes clear that that term, for purposes of the present case, refers to the crime of capital felony and not a part thereof. General Statutes § 53a-24 provides in relevant part: "(a) The term 'offense' means any crime or violation which constitutes a breach of any law of this state or of any other state, federal law or local law or ordinance of a political subdivision of this state . . . ."

judicial insertion. In my view, the "first part of [its] analysis is nothing more than a truism. The second part merely sets up the proverbial straw man." *Sheff* v. *O'Neill*, 238 Conn. 1, 94, 678 A.2d 1267 (1996) (*Borden, J.*, dissenting).

First, the majority states that there are two "constituent parts" to the capital offense at issue, namely, two murders. The majority then goes on to conclude that this fact "permits the interpretation that the aggravating factor [enumerated in § 53a-46a (i) (4)] may be satisfied by proof of its existence with respect to at least *one* of those constituent parts."[4] (Emphasis added.) In my view, this circular logic does nothing more than merely assume the majority's conclusion.[5]

[4] The majority cites *State* v. *Ross*, 230 Conn. 183, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), in support of its conclusion. Specifically, the majority relies on this court's suggestion in *Ross* that an aggravating factor can be established by proof "beyond the elements of the [capital felony] charged." Id., 264. The court in *Ross*, however, merely was rejecting the claim of the defendant that, inasmuch as certain elements of the crime with which he was charged overlapped with the evidence of the existence of an aggravating factor, that the aggravating factor could not be established. See id., 263–64. The majority does not explain the relevance of this quote from *Ross* beyond the out-of-context parenthetical that it provides.

[5] The entirety of the majority's contention on this score, its first one in support of its conclusion, is the following: "First, as our case law demonstrates, the constituent parts of the capital felony involved here are two murders that are committed in the course of a single transaction. See *State* v. *Solek*, 242 Conn. 409, 423, 699 A.2d 931 (1997) (constituent parts of capital felony under § 53a-54b [7] are murder and sexual assault in first degree). Thus, the reference in § 53a-46a (i) (4) to the offense must be read as referring to those constituent parts. This reading permits the interpretation that the aggravating factor may be satisfied by proof of its existence with respect to at least one of those constituent parts. See *State* v. *Ross*, 230 Conn. 183, 264, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 138 L. Ed. 2d 1095 (1995) (aggravating factor satisfied by proof of existence beyond the elements of the [capital felony] charged). Put another way, it would permit the interpretation that the language, the offense, refers to either of those parts, and does not necessarily refer to *both, and only both,* of those parts." (Emphasis in original; internal quotation marks omitted.)

I find this reasoning incomprehensible as the majority begins by stating that "the offense must be read as referring *to those constituent parts,*" and

The second rationale that the majority provides is more elaborate but, I believe, no more persuasive. The majority's construction of the statute at issue rests upon its analysis of the application of the aggravating factor enumerated in § 53a-46a (i) (4) to another capital offense, namely, murder in the course of a kidnapping. See General Statutes (Rev. to 1997) § 53a-54b (5). The majority concludes that when the legislature adopted the death penalty statute in 1973, it did *not* require the state to prove, in the context of a kidnap-murder, that both the kidnapping and the murder were committed in a cruel manner in order to establish the existence of the "cruel" aggravating factor. The majority reaches this important conclusion, which forms the entire underpinning of its theory, first, by explaining that when a capital felony involves only one underlying offense, e.g., murder for hire pursuant to § 53a-54b (2), the state need only prove that the *one* murder was committed in a cruel manner. The majority further states that if the defendant's interpretation were accepted, when a capital felony involves two underlying offenses, e.g., kidnapping and murder, the state would be required to prove that *both* offenses were committed in a cruel manner. In contemplating this result, the majority states that it "can conceive of no rationale for the legislature to have set a higher bar to the imposition of the death penalty when the underlying capital felony involve[s], not one, but two underlying serious felonies, namely, kidnapping and murder."

I see nothing irrational about a reading of the statute that would require proof of the existence of an aggravating factor as to all of the potentially applicable constituent parts of the offense. When a defendant is charged with two crimes and one crime has one element and

concludes, without any logical explanation, by stating that "the offense, refers to *either* of those parts . . . ." (Emphasis added; internal quotation marks omitted.)

the second crime has two elements, all things being equal, it will be harder for the state to prove the crime having two elements than the crime having one. This does not mean that the classification lacks a rationale, however. It simply means that the legislature intended to require proof of both elements of the crime before the defendant can be found guilty. Likewise, in determining the application of the aggravating factor enumerated in § 53a-46a (i) (4) to each of the capital offenses enumerated in § 53a-54b, it would not be irrational to conclude that the legislature required that, for each potential constituent part, the fact finder determine whether the defendant carried out the proscribed act in a cruel manner.[6]

Moreover, neither the text of the statute nor any a priori reasoning can reveal the degree of comparative moral abhorrence that the legislature attributed to a kidnap-murder as opposed to a murder for hire. The mere fact that a particular capital offense consists of two underlying felonies does not, in my view, necessarily suggest that the legislature believed that it should be just as easy to impose the death penalty for that capital offense as it is for another capital offense that the legislature had deemed abhorrent on the basis of the nature of the defendant's conduct or the status of the victim.

Having suggested this purported irrationality, the majority continues its analysis by stating that it makes little sense to think that, in 1980, when the legislature added multiple murders in the course of a single transaction to the list of capital felonies, it intended to change the manner in which the aggravating factor of § 53a-46a (i) (4) operates. The majority states that it can

---

[6] Although I do not believe that this would be an irrational statute for a legislature to enact, as the majority concludes, I do not think, as I describe in part II of this opinion, that this is the best reading of the death penalty statute.

conceive of no reason why the *legislature* would have intended to require proof of the existence of an aggravating factor only as to one of the constituent parts of the capital felony of kidnap-murder, but require proof of the existence of an aggravating factor as to both of the constituent parts of the capital felony of multiple murders committed in the course of a single transaction.

Although I acknowledge that it might be unusual for the aggravating factor enumerated in § 53a-46a (i) (4) to operate in this fashion, one obvious rationale for such an interpretation of the two statutes would be that the legislature did not deem multiple murders to be as morally abhorrent as a murder in the course of a kidnapping. In my view, not only is there nothing irrational about such a moral determination, but the legislative genealogy upon which the majority relies strongly suggests that the legislature did make such a determination.

As the majority acknowledges, the legislature designated kidnap-murder as a capital offense in 1973 but "made the policy choice not to include multiple murders within the definition of capital felony [at that time]." Footnote 12 of the majority opinion. The legislature did not make multiple murder a capital felony until 1980. Moreover, in 1980, notwithstanding the existing designation of kidnap-murder as a capital felony, several legislators expressed doubts about whether the moral abhorrence of multiple murders justified its classification as a capital felony. See, e.g., 23 H.R. Proc., Pt. 19, 1980 Sess., p. 5678, remarks of Representative Naomi W. Otterness ("I feel that when you are talking about one murder, two murders ad infinitum, what's the difference? Why is it now, that we have to say, when you have a murder of more than one person that it becomes a capital felony?"); id., p. 5679, remarks of Representative Paul Gionfriddo ("I don't believe that there is any qualitative difference between the murder of one person

and the murder of two people"); id., pp. 5680–81, remarks of Representative Rosalind Berman (questioning need to distinguish between status of multiple murders and "routine" or single murders). Thus, the majority need not look any farther than the legislative history of § 53a-54b to find evidence of a possible rationale for why the legislature might have chosen to require, in the context of a multiple murder capital felony, proof that each murder had been committed in a cruel manner, even if it is assumed that, in 1973, the legislature intended to require proof only that the murder was committed in a cruel manner in order to establish the existence of the "cruel" aggravating factor in the context of kidnap-murder.[7]

There is, however, an even more fundamental problem with the majority's reasoning, namely, that the majority's hypothetical rests entirely upon the *majority's* previous conclusion that, with regard to kidnap-murder, the state can establish the existence of the aggravating factor merely by proving that the murder was committed in a cruel manner. Obviously, the *legislature* did not have the benefit of the majority opinion in 1980 when it designated multiple murders as a capital felony. Thus, it makes no sense to rely upon what the majority labels a "perverse result" that derives from an

---

[7] Ironically, in part II of its opinion, the majority emphasizes the importance of legislative history in construing statutes, yet, in part I of its opinion, the majority proclaims the purported irrationality of the defendant's interpretation of § 53a-46a (i) (4), as it applies to § 53a-54b, without considering the views of those legislators who enacted § 53a-54b. Although I view the use of legislative history *to interpret a statute* with great skepticism; see part III of this opinion—indeed, in the case of the 1980 legislation that added multiple murders to the list of capital offenses, there were legislators who disagreed with the doubt expressed by other legislators regarding the need to add multiple murders to that list; see, e.g., 23 H.R. Proc., Pt. 19, 1980 Sess., p. 5682, remarks of Representative Gerard B. Patton—I believe that it is certainly appropriate to consult that history to determine whether there is *any possible rationale* for why a statute was enacted notwithstanding the majority's assertion to the contrary.

alternate interpretation of the statute when that result is premised entirely on an interpretation of the statute that the majority, itself, not the legislature, presents for the first time in its opinion in the present case.

Moreover, as I noted previously, the legislative genealogy of § 53a-54b reveals that the majority's conclusions about the rationality of various schemes of deterrence are unsupported. The majority concludes that "[a] capital felon who murder[s] two persons in the course of a single transaction must be regarded, *under any rational system of deterrence and moral hierarchy, as . . . at least equally morally blameworthy* to one who murders and either kidnaps or sexually assaults only one victim in the course of a single transaction. We cannot conceive of any legislative rationale pursuant to which the legislature would have intended, when it added multiple murder to the definition of capital felony, to set a higher bar to the imposition of the death penalty on multiple murder in a single transaction than it would have for murder-kidnap or murder-sexual assault in a single transaction." (Emphasis added.) Prior to 1980, however, the bar not only was higher for the former, but the legislature apparently did *not* regard a defendant who murdered two persons in the course of a single transaction as morally blameworthy as a defendant who murdered and kidnapped only one person in the course of a single transaction. Prior to 1980, a double murder, in the absence of other circumstances, could *not* result in the imposition of the death penalty whereas a kidnap-murder could. See, e.g., General Statutes (Rev. to 1979) § 53a-54b. Thus, the majority's logic is inexplicable, for the system of deterrence that the legislature adopted in 1973 is exactly the system that the majority now suggests is irrational.

This incongruity reveals the unsoundness of the majority's reliance upon its own notions as to the legislature's rationale behind the death penalty statute. The

majority contends that the defendant's interpretation of § 53a-46a (i) (4) must be incorrect inasmuch as there is no basis for finding that the legislature would have enacted a statute that is consistent with the interpretation advanced by the defendant. Yet, the death penalty statutory scheme that the legislature established in 1973, which designated kidnap-murder as a capital felony but not multiple murders in the course of a single transaction; see General Statutes (Rev. to 1975) § 53a-54b; is the very system of deterrence that the majority's analysis suggests is *irrational*. Thus, it is implicit in the majority's analysis both that: (1) the defendant's interpretation of § 53a-46a (i) (4) must be rejected because *it would have been irrational* for the legislature to have enacted such a statute; and (2) in 1973, the legislature enacted a death penalty statutory scheme that *is irrational*. This makes no sense.

The majority's response to this critique only further proves this point. The majority chides the dissent for "misconstru[ing] [its] reasoning," noting that any question regarding the rationality of the 1973 statute is not before this court. Footnote 12 of the majority opinion. I never have suggested that it is. On the contrary, what I have maintained as inexplicable is that, in one part of its analysis, the majority states that the defendant's interpretation must be rejected because, if it were applied to the death penalty statute, as enacted in 1973, it would lead to a purportedly irrational result. Specifically, the purportedly irrational result with which the majority is concerned is that it would be harder to establish the existence of the "cruel" aggravating factor in connection with kidnap-murder than in connection with murder for hire. Yet, the very next part of the majority's analysis assumes that the death penalty statute, as enacted in 1973, was irrational because it designated kidnap-murder, but not multiple murders, as a capital felony. I do not see how the defendant's interpre-

tation can be rejected on the ground that it supposedly suggests that the legislature enacted an irrational statute in light of the fact that the majority's own reasoning leads to the same conclusion. The majority never explains this paradoxical logic.

I also would note that, in responding to the dissent's critique, the majority simply elucidates its straw man technique further by stating that the question before the court is "whether, when [the legislature] did decide to include multiple murders in the capital felony scheme in 1980, [it] intended for the state to have a heavier burden with respect to the aggravating factor as applied to that crime than every other offense, including kidnap-murder, already included in that scheme." Footnote 12 of the majority opinion. Of course, as I previously noted, that is the question before this court *only* if it is assumed that the legislature intended, in the context of a kidnap-murder, to make proof of the existence of the aggravating factor enumerated in § 53a-46a (i) (4) dependent on whether the defendant committed the murder but not the kidnapping in a cruel manner. It is the *majority*, not the *legislature*, that has reached such a conclusion. The transparency of the majority's analysis is all too apparent owing to the fact that the majority provides *no* response to the dissent's criticism of the majority's critical misapplication of the aggravating factor of § 53a-46a (i) (4) to the capital felony of kidnap-murder, upon which the majority's opinion rests.

B

Even more distressing is the majority's rejection of the rule of lenity under the circumstances of the present case. The majority's rejection of this important rule is indefensible, especially in light of the fact that the majority's statutory interpretation rests on little more than its thrice stated confidence in its ability to discern

the irrationality of various possible death penalty schemes.

As the majority acknowledges, the rule of lenity applies whenever there is a reasonable doubt as to the scope of a statute. E.g., *State* v. *Sostre*, 261 Conn. 111, 120, 802 A.2d 754 (2002). Contrary to the majority's assertion that the rule of lenity is to be applied "like all . . . axioms of construction," however, the United States Supreme Court repeatedly has held that the rule is "*not* merely a convenient maxim of statutory construction." (Emphasis added.) *Dunn* v. *United States*, 442 U.S. 100, 112, 99 S. Ct. 2190, 60 L. Ed. 2d 743 (1979). As the United States Supreme Court consistently has reaffirmed, the rule of lenity is rooted in principles of due process and the separation of powers. E.g., id. (rule is rooted in fundamental principles of due process); *United States* v. *Bass*, supra, 404 U.S. 348 (twin rationales of rule of lenity are " 'fair warning' " and that "legislatures and not courts should define criminal activity"); *United States* v. *Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) ("The rule that penal laws are to be construed strictly . . . is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals . . . and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.").

In view of the majority's willingness to dispense with even the most bedrock principles of statutory interpretation; see part II of the majority opinion; its disregard of "the constitutional underpinnings of lenity" is of even greater consequence. Note, "The Mercy of Scalia: Statutory Construction and the Rule of Lenity," 29 Harv. C.R.-C.L. L. Rev. 197, 202 (1994); cf. *Lurie* v. *Wittner*, 228 F.3d 113, 123 n.4 (2d Cir. 2000) (rejecting government's claim that "rule of lenity is a statutory presumption lacking a constitutional dimension" inasmuch as rule

protects defendant's constitutional right to fair warning).

In the present case, the majority's acknowledgment that the defendant has the better textual argument dictates the conclusion that there is, at the very least, a reasonable doubt as to the interpretation of the statute. Indeed, in *State* v. *Harrell*, supra, 238 Conn. 828, this court emphasized that a criminal statute should not be applied so as to impose criminal liability unless the legislature has *"expressly* so intended." (Emphasis in original; internal quotation marks omitted.) Id., 832; accord *State* v. *Breton*, supra, 212 Conn. 268–69. I do not see how the majority possibly could reach such a conclusion in light of its determination that the *defendant* has the better textual argument. Apparently, neither does the majority; rather than attempting to distinguish this language in *Harrell*, the majority simply ignores *Harrell's* requirement of an *express* legislative intent. Furthermore, for the first time, this court, unlike any other court of which I am aware, holds that, although a review of the plain text of the statute *favors* the defendant's interpretation, other tools of statutory interpretation remove all reasonable doubt that the defendant's interpretation is erroneous.[8] In my view,

---

[8] Several members of the United States Supreme Court even have expressed their view that the rationale for the rule of lenity precludes consideration of extratextual sources to clarify an ambiguous statute. See *United States* v. *R. L. C.*, 503 U.S. 291, 307, 112 S. Ct. 1329, 117 L. Ed. 2d 559 (1992) (Scalia, J., with whom Kennedy and Thomas, Js., join, concurring in part and concurring in judgment) ("it is not consistent with the rule of lenity to construe a textually ambiguous penal statute against a criminal defendant on the basis of legislative history"); cf. *Hughey* v. *United States*, 495 U.S. 411, 422, 110 S. Ct. 1979, 109 L. Ed. 2d 408 (1990) ("[e]ven [when] the statutory language . . . [is] ambiguous, longstanding principles of lenity . . . preclude our resolution of the ambiguity against [the criminal defendant] on the basis of general declarations of policy in the statute and legislative history" [citation omitted]). But cf. *United States* v. *R. L. C.*, supra, 306 n.6 (plurality opinion) ("[w]hether lenity should be given the more immediate and dispositive role Justice Scalia espouses is an issue that is not raised and need not be reached"). I acknowledge that there are contrary indications in the decisions of the United States Supreme Court. See, e.g., *Moskal* v.

such a holding relegates the constitutionality mandated rule of lenity to a judicial nicety.

The majority's unprecedented conclusion is even more startling in view of the fact that this court has stated that "[i]t is axiomatic that any statutory construction implicating the death penalty must be based on a conclusion that the legislature has clearly and unambiguously made its intention known. . . . The rules of strict construction and lenity applicable to penal statutes generally are especially pertinent to a death penalty statute such as § 53a-54b." (Citations omitted; internal quotation marks omitted.) *State* v. *Harrell,* supra, 238 Conn. 833. In my view, it is manifestly unjust for the majority to interpret the death penalty statute so as to subject the defendant to the death penalty upon proof that one of the murders in the present case was committed in a cruel manner, while also stating that the text of the statute suggests that proof that both murders were committed in a cruel manner is required. This is particularly so when the majority fails to provide any persuasive reason justifying such an interpretation, much less offer an interpretation that establishes beyond a reasonable doubt that the legislature *expressly* intended such a result.

Finally, contrary to the majority's assertion, I do not conclude that the rule of lenity applies "in every case

*United States,* 498 U.S. 103, 108, 111 S. Ct. 461, 112 L. Ed. 2d 449 (1990) (rule of lenity applies, if at all, only after consideration of "the language and structure, legislative history, and motivating policies" of statute [internal quotation marks omitted]). This court previously has relied on the *Moskal* formulation, as the majority does in the present case, without considering whether it is consistent with, for example, the fair warning rationale behind the rule. See generally, e.g., *State* v. *Jason B.,* 248 Conn. 543, 555, 729 A.2d 760, cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d 316 (1999).

In any event, although acceptance of the Scalia-Kennedy-Thomas understanding of the rule of lenity would require that the defendant prevail in the present case, I need not pursue this issue any farther inasmuch as I conclude that the other tools of interpretation upon which the majority relies do not come close to removing reasonable doubt as to the statute's meaning.

in which the defendant [is] able to muster a plausible, albeit erroneous, interpretation of a criminal statute." Footnote 15 of the majority opinion. Likewise, I reject the majority's characterization of my dissent as suggesting that the rule of lenity applies whenever a "defendant's interpretation appears to be plausible." Id. Rather, I am simply unable to conclude beyond a reasonable doubt, as our law requires; see, e.g., *State* v. *Sostre*, supra, 261 Conn. 120; that the defendant's interpretation of the statute is, in fact, erroneous. Had the majority properly applied the rule of lenity, it would have reached the same conclusion.

Instead of reaching this conclusion, however, the majority employs its familiar straw man technique and suggests that my application of the rule of lenity would dictate that defendants in criminal cases with statutory interpretation claims almost always prevail. On the contrary, this court long has employed the reasonable doubt formulation, as I do in this opinion, and only rarely has it concluded that the rule applied. That is because, contrary to the majority's belief that nearly all cases of statutory interpretation give rise to arguments that raise a reasonable doubt as to a statute's application, a view engendered by its relativistic method of statutory interpretation; see part III of this opinion; this court and other courts routinely reject arguments that fail to raise such a doubt. When, however, as in the present case, a defendant has a strong textual argument—indeed, in the majority's view, the *strongest* textual argument—it is clear that the rule of lenity applies.

II

In contrast to the majority's determination that the defendant has a strong textual argument, I believe that the text of § 53a-46a (i) (4) does not require the state to prove the existence of the aggravating factor as to

each individual constituent part, in the present case, each individual murder. I also would conclude, however, that, after interpreting the statute, a reasonable doubt persists about whether the legislature expressly intended that the death penalty be imposed under the circumstances of the present case. Therefore, I would uphold the trial court's application of the rule of lenity and require that the state prove beyond a reasonable doubt that both murders were committed in a cruel manner in order to satisfy its burden of establishing the existence of the aggravating factor enumerated in § 53a-46a (i) (4).

As I noted previously, the state satisfies its burden of establishing the existence of the aggravating factor enumerated in § 53a-46a (i) (4) when it proves that "the defendant committed *the offense* in an especially heinous, cruel or depraved manner . . . ." (Emphasis added.) General Statutes (Rev. to 1997) § 53a-46a (i) (4). I conclude that the italicized term, "the offense," refers to the capital offense or, in other words, the crime of capital felony. See generally General Statutes (Rev. to 1997) § 53a-54b. In the present case, the particular capital felony with which the defendant was charged is the "murder of two or more persons at the same time or in the course of a single transaction . . . ." General Statutes (Rev. to 1997) § 53a-54b (8).

In my view, the text of § 53a-46a (i) (4) does not suggest that the state must prove, in the context of multiple murders, that both murders were committed in a cruel manner in order to satisfy its burden of establishing the existence of the aggravating factor, as the defendant argues. I also reject the majority's conclusion that the sentencer should determine if either of the two murders was committed in a cruel manner and return a verdict in favor of the death penalty if it determines that one was committed in a cruel manner. Rather, I believe that the statute requires the state to prove that

the offense, as a whole, was committed in a cruel manner. In other words, I believe that the statute requires the sentencer to consider the totality of the circumstances surrounding the commission of the offense. I do not believe that the statute requires the sentencer to focus its analysis on a determination of whether each constituent part of the offense was committed in a cruel manner.

Our death penalty case law is consistent with my interpretation of the statute. I begin by acknowledging that this court expressly reserved the issue presented in the present case in *State* v. *Breton*, 235 Conn. 206, 220 n.15, 663 A.2d 1026 (1995). This court never has tied aggravating factors to the particular constituent parts of a capital felony in any of this court's many previous death penalty cases. See generally, e.g., *State* v. *Johnson*, 253 Conn. 1, 751 A.2d 298 (2000); *State* v. *Cobb*, 251 Conn. 285, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Webb*, 238 Conn. 389, 680 A.2d 147 (1996); *State* v. *Ross*, 230 Conn. 183, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995).

On the contrary, this court's analysis has focused on the totality of the circumstances surrounding the offense in determining whether the evidence was sufficient to support a finding that the aggravating factor of § 53a-46a (i) (4) had been adequately established. For example, in *State* v. *Cobb*, supra, 251 Conn. 285, this court noted that "[t]he evidence supports the determination that the victim experienced extreme psychological and physical pain and suffering *throughout this entire episode*." (Emphasis added.) Id., 449. Similarly, in *State* v. *Webb*, supra, 238 Conn. 389, this court noted that, "[p]rior to her death, [the victim] *experienced a prolonged abduction* during which she was held at gunpoint while the defendant drove, for approximately

twelve minutes, to a park nearly four miles away from the point of abduction." (Emphasis added.) Id., 486. In neither case did the court ask whether the "cruel" aggravating factor was applicable to each constituent part of the capital felony at issue.

Likewise, in *State* v. *Ross*, supra, 230 Conn. 183, this court stated that "the jury received evidence about the effect of the kidnapping as an aggravating factor for the capital felony count predicated on a sexual assault, and evidence about the effect of the sexual assault as an aggravating factor for the capital felony count predicated on a continuing kidnapping." Id., 264. In *Ross*, this court did *not* indicate whether the kidnapping aggravated the sexual assault or the murder component of the sexual assault-murder capital felony. Similarly, the court did *not* indicate whether the sexual assault aggravated the kidnapping or the murder component of the kidnap-murder capital felony.

Finally, in *State* v. *Johnson*, supra, 253 Conn. 1, the court expressly acknowledged that, "[a]lthough there are cases in which a near instantaneous death by gunfire could satisfy the . . . aggravating factor [enumerated in § 53a-46a (i) (4)], typically such cases have involved extreme fear, emotional strain and terror *during the events leading up to the murder*." (Emphasis added.) Id., 74–75. In other words, in such a case, the act of murdering the victim, itself, is *not* committed in a cruel manner.[9] Nevertheless, what this court was suggesting in *Johnson* is that, in light of the totality of the circumstances surrounding the commission of the offense in such a hypothetical case, we *would* conclude that the

[9] Indeed, it is apparent from this court's inclusion of *psychological* cruelty as a category of conduct that may qualify under § 53a-46a (i) (4); see, e.g., *State* v. *Johnson*, supra, 253 Conn. 67; that the state may establish the existence of that factor without proof that the defendant had inflicted extreme *physical* pain, suffering or torture on the victim.

defendant committed such an offense in a cruel manner. See id.

Such analysis makes perfect sense to me. If a defendant kidnaps and brutally tortures someone and then kills that person, is that a cruel *kidnapping* or a cruel *murder*? More importantly, does the statutory scheme require that the sentencer make such a determination? In my view, there is nothing in the text of the statute that suggests that such an inquiry is necessary. On the contrary, I believe that the statutory scheme simply requires that, when a person kidnaps and brutally tortures the victim and then kills the victim, the question for the sentencer is whether, under the totality of the circumstances, the offense, considered as a whole, was committed in a cruel manner. Likewise, when two murders are involved, as in the present case, the question is whether, under the totality of the circumstances, the offense, considered as a whole, was committed in a cruel manner.

I also note that this court repeatedly has held that the legislature is presumed to know how to draft a statute to reach a particular result. See, e.g., *State* v. *King*, 249 Conn. 645, 684, 735 A.2d 267 (1999) ("if the legislature had sought to distinguish between the different degrees of kidnapping for purposes of § 53a-54b [5], it knew how to do so"). Indeed, the legislature expressly could have required the state to prove that a capital felon committed *all of the constituent parts* of the offense in a cruel manner, as the defendant would have us construe the statute. Conversely, the legislature expressly could have required that the state merely prove that the defendant committed *at least part of* the offense in a cruel manner, as the majority concludes.[10] The legislature chose neither option. Instead, it required

---

[10] See part I of this opinion for a discussion about why the latter interpretation is a particularly poor interpretation.

the state to prove that the defendant committed *"the offense"* in a cruel manner. (Emphasis added.) General Statutes (Rev. to 1997) § 53a-46a (i) (4). Consequently, the text of § 53a-46a (i) (4) should not be interpreted as either the defendant or the majority suggests.

Although I would conclude that the text of the statute strongly supports my conclusion,[11] I am unable to conclude beyond a reasonable doubt, as our law requires; see, e.g., *State* v. *Sostre*, supra, 261 Conn. 120; that the defendant misconstrues the scope of the statute. Indeed, the fact that neither the majority nor the state, the trial court, or the defendant has construed the statute in the way that I believe the text warrants, strengthens my ultimate conclusion that the rule of lenity should apply.

Therefore, I would conclude, as this court did in *State* v. *Harrell*, supra, 238 Conn. 828, that "[w]hen, as in th[e] [present] case, the imposition of the death penalty is the possible consequence of our decision, we must not toy with competing, plausible interpretations of a statutory penal scheme." Id., 838. Accordingly, I would uphold the trial court's application of the rule of lenity under the circumstances of the present case.

### III

I also strongly disagree with the majority's approach to statutory interpretation and its abandonment of the plain meaning rule. In my view, the majority's opinion is an exemplar of the problems engendered by such an approach. I propose an alternative approach that builds

---

[11] None of the other tools of statutory interpretation informs my interpretation of the issue in the present case. There are no other related statutes or common-law principles that are helpful in guiding the interpretation. Moreover, as I previously discussed, the legislative genealogy upon which the majority relies is unpersuasive. Likewise, for reasons that I discuss later in this opinion, I believe that the evidence of the statute's purpose upon which Justice Katz relies in her separate opinion also is uninformative.

upon the plain meaning rule and describes the manner in which I apply the various tools of statutory interpretation.

## A

The majority's method of statutory interpretation is radical, its central premise is misguided, and its application is likely to lead to an unpredictable and unconstrained statutory interpretation jurisprudence. I discuss each of these conclusions in turn.

As the majority acknowledges, its approach to statutory interpretation "has not been adopted in the same specific formulation by *any* other court in the nation." (Emphasis added.) Footnote 19 of the majority opinion. I think for good reason.

My most fundamental disagreement with the majority's approach to statutory interpretation is its heavy reliance upon unexpressed statutory purposes.[12] Such reliance is particularly inappropriate when a statute's text is plain and unambiguous. Indeed, even proponents of the purposive approach to statutory interpretation that the majority embraces acknowledge that nontextual sources should be resorted to only when a statute is *unclear*. See, e.g., S. Breyer, "On the Uses of Legislative History in Interpreting Statutes," 65 S. Cal. L. Rev. 845, 848 (1992) (legislative history is useful in interpreting *unclear* statutes). Thus, the majority's contention that a statute's unenumerated purpose can trump statutory language that is plain and unambiguous is truly beyond the pale. I am particularly troubled by such an approach because I agree with John M. Walker, Jr., the chief judge of the United States Court of Appeals for the Second Circuit, who recently assessed the lack of usefulness of the purposive method of statutory interpretation: "[A

---

[12] In so stating, I do not intend to de-emphasize my fundamental disagreement with the majority's rejection of the plain meaning rule.

legislative] purpose, whether derived from legislative history, the entirety of the statute, the mischief at which the statute is aimed, or the judge's imagination, is normally of such generality as to be useless as an interpretative tool, unless, of course, it is being used as a cover for the judge to 'do justice' as he sees fit." J. Walker, Jr., "Judicial Tendencies in Statutory Construction: Differing Views on the Role of the Judge," 58 N.Y.U. Ann. Surv. Am. L. 203, 236 (2001).[13]

Indeed, I think that it is highly questionable whether it is epistemologically possible for legislation to reflect any single underlying purpose. In my view, notions of extratextual legislative intent or purpose are devoid of meaning because a "group may act (for example, by enacting a statute), but it is a mistake to attribute a collective intention to its action." B. Karkkainen, " 'Plain Meaning': Justice Scalia's Jurisprudence of Strict Statutory Construction," 17 Harv. J.L. & Pub. Policy 401, 415–16 (1994). In other words, "[i]ndividuals may have mental states, but groups do not." Id., 415; see also M. Radin, "Statutory Interpretation," 43 Harv. L. Rev. 863, 870 (1930) (it is "transparent and absurd fiction" to attribute collective intent to entire legislative body).

Moreover, as defenders of the purposive method of statutory interpretation have acknowledged, even if it were theoretically possible to uncover a statute's purpose with sufficient specificity to guide the interpreta-

---

[13] For example, in her separate opinion, Justice Katz notes that the defendant claims that the legislature's purpose in enacting § 53a-54b and, in particular, subdivision (8) of that section, which contains the multiple murder provision, was to adopt a narrow capital felony scheme under which only extreme murders qualify a person for the death penalty. In contrast, Justice Katz concludes that the legislature's purpose in enacting § 53a-54b (8) was the deterrence of multiple murders. In my view, irrespective of who is correct, however, the generality of these supposed purposes render them useless in interpreting the specific statutory provisions at issue in the present case.

tive process of the particular issue before the court, public choice theory presents a "substantial" critique of such a method. S. Breyer, supra, 65 S. Cal. L. Rev. 866. Such a theory teaches that legislation is the product of bargaining between various interest groups rather than an underlying common will or purpose among legislators. Id. Thus, the theory suggests, as an empirical matter, that statutes will rarely have a single purpose that can guide interpretation.[14]

Finally, beyond properly stating that "the language of the statute is the most important factor to be considered," the majority, in introducing its new approach to statutory interpretation, fails to provide any guidance as to the significance that should be attached to the other interpretative tools that its approach encompasses. Instead, the majority's approach envisions the interpretation of statutes on a case-by-case basis, whereby the judicial authority can pick and choose from among various tools of interpretation to construct a meaning that might reflect a reasoned judgment. In contrast, I believe that an explanation of the relative usefulness of the various tools of statutory interpretation is of vital importance in providing litigants, judges, legislators and the public with clear guidance and notice as to how the statutes of this state will be interpreted in future cases.[15]

B

As problematic as the majority's approach to statutory interpretation is in a case in which a statute is ambiguous, the majority's representation that it will apply such an approach even when a statute's text is clear is even more problematic. In other words, I am

---

[14] See footnote 13 of this opinion for a description of two plausible views as to the purposes behind the statutory provisions at issue in the present case.

[15] In part III C of this opinion, I present an alternative approach to statutory interpretation that provides such an explanation.

in sharp philosophical disagreement with the majority's express abandonment of the plain meaning rule.

As a preliminary matter, it is important to note that, in stating that when the plain meaning rule is applied, a court is *"precluded as a matter of law"* from inquiring beyond the text of a statute; (emphasis in original); the majority suggests that the plain meaning rule is a rule of law. It is well established, however, that "the plain-meaning rule is rather an axiom of experience than a rule of law . . . ." (Internal quotation marks omitted.) *Public Citizen* v. *United States Dept. of Justice*, 491 U.S. 440, 455, 109 S. Ct. 2558, 105 L. Ed. 2d 377 (1989). Thus, the rule, as well as the majority's rejection of the rule, is one of judicial *philosophy*, not one of *substantive law*. Accordingly, it follows that part II of the majority opinion, in which the majority expresses the judicial philosophy of five members of this court, does not describe the manner in which I will interpret statutes.

The majority essentially outlines the plain meaning rule in a manner that is consistent with the way in which I view the rule. There is, however, one important statement that the majority makes in describing the rule with which I take issue. The majority maintains that, under the plain meaning rule, as well as the majority's own approach to statutory interpretation, "the task of the court is to ascertain *the intent of the legislature* in using the language that it chose to use, so as to determine [the] meaning [of that language] in the context of the case." (Emphasis added.) The plain meaning rule, however, is premised on the idea that we are governed by what the legislature actually said as opposed to that which it intended to say. Thus, while the majority's approach strives to uncover *subjective legislative intent*, the plain meaning rule searches for a statute's *objective textual meaning.*[16]

---

[16] On a more technical note, the majority also states "that [this court has] not been consistent in [its] formulation of the plain meaning rule." Footnote 24 of the majority opinion (comparing *Sanzone* v. *Board of Police Commis-*

With that clarification, I agree with the majority that the plain meaning rule dictates that, if the language of a statute is plain and unambiguous, and if a construction based on the plain and unambiguous language of the statute does not yield an absurd result, then the court should end its inquiry there. In my view, the majority's disavowal of this rule is unwarranted and problematic for several reasons.

First, it bears emphasizing that the majority essentially declares that a method of statutory construction used by this court in literally hundreds of cases over the past century, including very recent cases, was incorrect. See, e.g., *MacDermid, Inc.* v. *Dept. of Environmental Protection*, 257 Conn. 128, 154, 778 A.2d 7 (2001); *Rizzo Pool Co.* v. *Del Grosso*, 240 Conn. 58, 74, 689 A.2d 1097 (1997); *State* v. *Blasko*, 202 Conn. 541, 553, 522 A.2d 753 (1987); *State* v. *Springer*, 149 Conn. 244, 248, 178 A.2d 525 (1962); *Evans* v. *Administrator, Unemployment Compensation Act*, 135 Conn. 120, 124, 61 A.2d 684 (1948); *Lee Bros. Furniture Co.* v. *Cram*, 63 Conn. 433, 438, 28 A. 541 (1893).[17] We were not alone. As the author of a leading treatise on statutory interpretation has explained, the plain meaning rule is "[a] basic

*sioners*, 219 Conn. 179, 187–88, 592 A.2d 912 [1991] with *State* v. *Cain*, 223 Conn. 731, 744–45, 613 A.2d 804 [1992]). The multistep process that the court referred to in *Sanzone* was *not* the plain meaning rule, however. Rather it was a process that we stated we would follow in the *absence* of a plain and unambiguous statute. See *Sanzone* v. *Board of Police Commissioners*, supra, 187. In contrast, the multistep process that this court described in *Cain* simply consisted of *qualifications* of the plain meaning rule. See *State* v. *Cain*, supra, 744. Thus, I do not see any conflict between *Sanzone* and *Cain*.

[17] Indeed, the genesis of the *majority's* approach can be traced to *Texaco Refining & Marketing Co.* v. *Commissioner of Revenue Services*, 202 Conn. 583, 522 A.2d 771 (1987), a case in which the court cites to cases that expressly state the *plain meaning rule*. Id., 589, citing *Dart & Bogue Co.* v. *Slosberg*, 202 Conn. 566, 572, 522 A.2d 763 (1987), *State* v. *Blasko*, 202 Conn. 541, 553, 522 A.2d 753 (1987), and *Rhodes* v. *Hartford*, 201 Conn. 89, 93, 513 A.2d 124 (1986).

insight about the process of communication . . . given classic expression by the Supreme Court of the United States . . . ." 2A J. Sutherland, Statutory Construction (6th Ed. Singer 2000) § 46.01, p. 113.[18] Similarly, a federal circuit court of appeals recently referred to this principle of statutory interpretation as "too elementary to require a citation . . . ." *Cline* v. *General Dynamics Land Systems, Inc.*, 296 F.3d 466, 467 (6th Cir. 2002). The rule's doctrinal pedigree is, indeed, impressive. The principle upon which the rule is premised can be traced at least as far back as Blackstone. See 1 W. Blackstone, Commentaries on the Laws of England (1765) pp. 59–62. One commentator has noted that the United States Supreme Court first articulated the rule as early as 1928 in *United States* v. *Missouri Pacific R. Co.*, 278 U.S. 269, 278, 49 S. Ct. 133, 73 L. Ed. 322 (1929). B. Karkkainen, supra, 17 Harv. J.L. & Pub. Policy 433. The United States Supreme Court continues to rely on the rule in construing federal statutes. E.g., *Barnhart* v. *Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S. Ct. 941, 151 L. Ed. 2d 908 (2002). Indeed, an *overwhelming* majority of federal and state courts adhere to the plain meaning

[18] In contrast, the majority asserts that this "rigid threshold-passing requirement as a route to determining the meaning of statutory language is simply counter to any ordinary way of determining the meaning of [statutory] language." Footnote 24 of the majority opinion. On the contrary, I agree with the Sutherland treatise and the United States Supreme Court that the plain meaning rule is the *primary* way by which we communicate. The interpreter reads or listens to a statement and accords that statement its ordinary and plain meaning, inquiring further only when there is some ambiguity inherent in the statement. Moreover, such an approach is hardly foreign to our law. One need only look to the parol evidence rule to find another manifestation of this basic method of human communication. See, e.g., *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, 231 Conn. 756, 780–81, 653 A.2d 122 (1995) ("Parol evidence offered solely to vary or contradict the written terms of an integrated contract is . . . legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant."); see also *Canaan National Bank* v. *Peters*, 217 Conn. 330, 337, 586 A.2d 562 (1991) ("[a] court may not stray beyond the four corners of the will where the terms of the will are clear and unambiguous" [internal quotation marks omitted]).

rule. 2A J. Sutherland, supra, § 46.01, pp. 113–15 n.1 (citing cases).

Moreover, as an empirical matter, it is not unusual for a court to find that the text of a statute is plain and unambiguous. See, e.g., W. Eskeridge, Jr., "The New Textualism," 37 U.C.L.A. L. Rev. 621, 656 (1990) ("the [United States] Supreme Court has decided almost half of its statutory interpretation cases by reference to a statute's plain meaning in each of the last three [t]erms"). Thus, notwithstanding the majority's suggestion that there is "really nothing startlingly new about" its approach to statutory interpretation, the majority's rejection of the plain meaning rule renders this court an outlier among nearly all other federal and state courts in this country and, indeed, with respect to this court's jurisprudence for the last 100 years, on an issue of great importance.[19] This *is* a startling, and in my view, unjustified, course for the majority to take.

Furthermore, not only has the plain meaning rule long been a bedrock principle of statutory interpretation in both this state and throughout the country, but the majority has failed to provide any evidence that the plain meaning rule has impeded this court's interpretative process. Indeed, no party in this case, nor in any other case of which I am aware, has ever even asked this court to abandon the plain meaning rule. Instead, the majority's departure from the legal mainstream comes solely as a result of its philosophical bent, one that I am confident will some day prove to be as unsound as it is rare.

The majority's abandonment of the plain meaning rule is unjustified for three related reasons. Most importantly, the plain meaning rule is premised on the

---

[19] Elsewhere in its opinion, the majority acknowledges that its approach to statutory interpretation is unprecedented. See footnote 19 of the majority opinion.

fact that only the text of a statute formally has been approved by the legislature and signed into law by the executive. The aspirations of legislators as expressed in the legislative history or this court's notions concerning the rationality of various legislative schemes have not. Thus, through its application of plain and unambiguous language, the rule gives effect to "the essence of the famous American ideal . . . [a] government of laws, not of men." A. Scalia, A Matter of Interpretation: Federal Courts and the Law (A. Gutmann ed., 1997) p. 17. Accordingly, it is the objective meaning of a statute's text that should govern rather than the legislature's subjective intent in choosing that text. See, e.g., O. Holmes, "The Theory of Legal Interpretation," 12 Harv. L. Rev. 417, 419 (1899) ("[w]e do not inquire what the legislature meant; we ask only what the statute means").

In light of the majority's new approach to statutory construction, individuals no longer can rely on the plain meaning of the laws of this state in conducting their affairs. Instead, they will be forced to rely on this court's ex post facto use of extratextual sources to discern the scope of a statute. I agree with United States Supreme Court Justice Antonin Scalia's eloquent expression regarding the essential unfairness of such a system: "I think . . . that it is simply incompatible with democratic government, or indeed, even with fair government, to have the meaning of a law determined by what the lawgiver meant, rather than by what the lawgiver promulgated. That seems to me one step worse than the trick the emperor Nero was said to engage in: posting edicts high up on the pillars, so that they could not easily be read. Government by unexpressed intent is similarly tyrannical." A. Scalia, supra, p. 17.

The present case aptly illustrates Justice Scalia's concerns. In essence, the majority rejects the defendant's interpretation because it concludes that the legislature meant something different than what is conveyed by

the text the legislature used in the statute. My concerns are heightened more so in *the present case* in light of the fact that, until today, this court, for more than 100 years, consistently has followed the plain meaning rule. That is to say nothing of the fact that the use of extratextual sources that the majority refers to in its opinion justifying deviation from this supposed plain meaning is, as I describe in part I of this opinion, unpersuasive and, by definition, insufficient to demonstrate an *express* legislative intent.

The plain meaning rule encourages both judicial restraint and predictability in interpretation. See J. Walker, Jr., supra, 58 N.Y.U. Ann. Surv. Am. L. 238. Indeed, a court's disregard of the plain meaning of a legislature's enactments amounts to little more than judicial lawmaking. Such judicial lawmaking constitutes an arrogation of the legislature's constitutional responsibility to enact laws.

Moreover, the majority's abandonment of the plain meaning rule and its adoption of the alternative purposive approach to statutory interpretation pays little heed to this fundamental principle of the separation of powers. In applying the majority's approach, a judge will ask himself for what purpose was the statute enacted. In answering this question, a judge likely will ask what purpose a wise and intelligent lawmaker would have attached to the statute. The judge then will ask himself what he, who, after all, also is wise and intelligent, believes the law's purpose is. Id., 223. In so doing, the judge will assume the role of law giver and substitute judicially ascribed notions of the statute's purpose for the plain meaning of the text that the legislature has chosen. See id. This is precisely what the majority transparently has done in the present case. Indeed, each step in the majority's analysis begins with a statement such as, "[w]e can conceive of no rationale for the legisla-

ture" to have enacted a statute that differs in interpretation from that proposed by the majority.[20]

Conversely, the incentive for legislators to write clear statutes and for interest groups to prevail in getting their views enacted into law takes on a diminished importance if it is made known to them that this court will not limit itself to the plain meaning of the law but, rather, will decide cases on the basis of the unenacted purposes behind a law.[21] By contrast, the plain meaning rule encourages legislators to "fulfill their constitutional responsibility to legislate by disabusing them of the expectation that the courts will do it for them." J. Walker, Jr., supra, 58 N.Y.U. Ann. Surv. Am. L. 235.

The majority offers three criticisms of the plain meaning rule, which, according to the majority, provide justi-

[20] The illogicality of such reasoning is demonstrated by a simple hypothetical. Consider the following hypothetical statute:

(a) In the context of the capital offense of kidnapping committed in the course of a murder, the state need only prove that the murder was committed in a cruel manner in order to establish the existence of the aggravating factor for offenses committed in a cruel manner.

(b) Notwithstanding subsection (a), in the context of the capital offense of two murders committed in the course of the same transaction, the state must prove that both murders were committed in a cruel manner in order to establish the aggravating factor for offenses committed in a cruel manner.

Inasmuch as the basis for the majority's opinion in the present case is the purported irrationality of such a statute, one is left to wonder whether, notwithstanding the legislature's use of plain and unambiguous language in this hypothetical statute, the majority would conclude, under the statute, that the state need only prove that *one* murder in a multiple murder case was committed in a cruel manner in order to prove the existence of the aggravating factor.

[21] Although the majority suggests, without citation, that it is inappropriate to consider such an incentive when interpreting statutes; see footnote 32 of the majority opinion; I note that the United States Supreme Court has suggested that courts should consider just this in interpreting criminal statutes. See *Dunn* v. *United States*, supra, 442 U.S. 112–13 ("to ensure that a legislature speaks with special clarity when marking the boundaries of criminal conduct, courts must decline to impose punishment for actions that are not plainly and unmistakably proscribed" [internal quotation marks omitted]).

fication for its rejection of the rule. I find the majority's criticisms unpersuasive. First, the majority states that "the rule is fundamentally inconsistent with the purposive and contextual nature of legislative language." Therefore, the majority states, "it *does* matter what meaning the legislature intended [statutory] language to have." (Emphasis in original.) Yet, the mere fact that the legislature *may* have had a purpose in enacting a statute does not mean that we should give *effect* to such an unenumerated purpose. In construing statutes, I believe that a court should not be governed by such *unstated purposes* but, rather, by what the legislature actually enacted into *law*. Thus, I disagree with the majority's proposition that, simply because legislation may have a purpose, that purpose is relevant to a court's construction of that legislation.

Second, the majority asserts that "the plain meaning rule is inherently self-contradictory." In support of its assertion, the majority questions the validity of the frequently heard refrain that, "if the language is plain and unambiguous, there is no room for interpretation . . . ." The majority states that, in such a case, there is interpretation and that, even though interpretation may be a "simple matter" under such circumstances, interpretation still exists. Without disagreeing with the majority, I do not see what difference this makes. Whether we label it "interpretation," "application of the plain meaning rule," or "a merry dance," I simply do not see this as a reason to reject the plain meaning rule.

The majority's other contention in this regard, namely, that the "absurdity" exception to the plain meaning rule somehow suggests that the rule's true goal is to reveal legislative intent, also is misguided. An absurd statute, like an ambiguous statute, causes an objective interpreter to inquire further into its meaning. Thus, the determination of a provision's plain meaning should not end a court's inquiry under such circum-

stances, not because the rule is concerned with uncovering what the legislature intended, but because a reasonable person would not believe that the law is what it appears to be on its face.[22]

Third, the majority contends that the rule has spawned a body of inconsistent law regarding whether a plain meaning can be found and that such inconsistencies leave this court vulnerable to criticism for what may be perceived as a result oriented work product. Yet, it seems entirely unfair to cite to misguided *deviations* from the plain meaning rule as a reason not to *follow* the rule. In my view, many of the "intellectually and linguistically dubious" decisions to which the majority cites are examples of why this court should follow the plain meaning rule more closely, not why this court should abandon the rule. See, e.g., *Conway* v. *Wilton*, 238 Conn. 653, 664–65, 680 A.2d 242 (1996); *State* v. *Cain*, 223 Conn. 731, 744–45, 613 A.2d 804 (1992).

In fact, the dissenting justice in *Cain* made just this point: "The application of Connecticut's rules of construction has become exceedingly complex and unpredictable. This is due, in part, to the fact that the rule prohibiting a court from looking behind the plain and unambiguous language of an act has become blurred to the point where the court will often look beyond

---

[22] The majority also claims that the fact that some courts, not including this court, have recognized an exception to the plain meaning rule when the legislative history reveals a scrivener's error in the drafting of the statute demonstrates a "fundamental flaw" in the rule. Footnote 26 of the majority opinion. It is hard to understand how this exception possibly could demonstrate a "fundamental flaw" in the plain meaning rule in light of the fact that, as the majority acknowledges, this court *never* has had occasion to consider this exception notwithstanding the century old application of the rule in Connecticut courts. Thus, regardless of whether this court would choose to use legislative history to override the plain meaning of a statute in such an instance, the extreme rarity of this example makes it obvious that this exception carries with it no license for the wholesale abandonment of the plain meaning rule.

that language without first deciding the threshold issue of whether an ambiguity exists. . . . Thus, one can never be certain, no matter how clear and unambiguous the language of an act may be, that the court will not look beyond that language and interpret it in a manner contrary to its literal meaning. . . . Where these rules are employed with respect to an unambiguous statute, the likelihood of an erroneous interpretation is significantly increased." (Citation omitted; internal quotation marks omitted.) *State* v. *Cain,* supra, 223 Conn. 756 n.3 (*Berdon, J.,* dissenting), quoting R. Williams, "Statutory Construction in Connecticut: An Overview and Analysis," 62 Conn. B.J. 307, 343 (1988).

Moreover, even if one accepts the premise that it is difficult to craft a plain meaning rule that fosters consistency in statutory interpretation, the debate the rule engenders with respect to the validity of textual arguments is one of the most important reasons justifying adherence to the rule. In other words, I believe that the plain meaning rule's ubiquity in our legal landscape is due in no small measure to the fact that it emphasizes the primacy of the text by advising litigants, legislators and judges that the best textual argument is likely to be the argument that prevails.

I also strongly disagree with the majority's proposition that adherence to the plain meaning rule leaves this court vulnerable to criticism of being "result-oriented." On the contrary, it is the majority's case-by-case approach to statutory interpretation that is subject to such criticism inasmuch as it encourages as a virtue unfettered discretion in utilizing the various tools of statutory construction. Such an approach expands the judiciary's power to the detriment of the legislature by allowing courts to depart from the plain meaning of the law under the guise of interpretation. Indeed, the majority's nebulous relativistic approach, under which all factors are considered, and under which no factor

aside from the text is taken as a priori more informative than any other, virtually guarantees that there will be *some* evidence for nearly *any* interpretation that a court may wish to advance. As Justice Scalia has noted in paraphrasing Judge Harold Leventhal's statements about the expanded use of just one of the many tools that the majority embraces today: "[T]he trick is to look over the heads of the crowd and pick out your friends. The variety and specificity of result that [the majority's approach] can achieve is unparalleled." A. Scalia, supra, p. 36.

Thus, it is the majority's approach that will "give the appearance of . . . result-oriented decision-making . . . ." Footnote 28 of the majority opinion. Indeed, in my view, litigants are unlikely to trust a court that feels free to disregard the plain meaning of the law. Those litigants are more likely to view such a court as one that simply does justice as it sees fit rather than one that applies the law evenhandedly. This appearance presents a grave danger to an institution that depends upon such trust as an essential source of its legitimacy.

Finally, I respond briefly to the majority's major criticisms of this opinion. First, the majority contends that the dissent's embrace of the plain meaning rule causes it to ignore statutory purpose. Yet, the plain meaning rule simply embodies the commonsense notion that when the text of a statute is plain and unambiguous, the statute's purpose will be reflected in the text. That is why even proponents of the purposive approach to statutory interpretation, unlike the majority, believe that, when the language is plain and unambiguous, it should be given effect. Indeed, no court, with the exception of those in Alaska, has stated that it may disregard the legislature's use of plain and unambiguous language in favor of a judicially determined statutory purpose.

Second, with regard to the issue of whether judges employing the majority's approach to statutory interpre-

tation will be more likely to substitute their own notions of wise and intelligent policy for those of the legislature, I think one need look no further than the majority's own words in the present case. As I noted previously, the majority, itself, expressly states that its approach to statutory interpretation rests upon its assessment of the rationality of various possible death penalty schemes.

Third, with regard to the majority's assertion that "there is simply no basis for" the dissent's contention "that the plain meaning rule is based on the constitutional doctrine of the separation of powers," my only response is that there simply is no basis for the majority's assertion. In surveying the plain meaning rule, the author of the leading treatise on statutory interpretation could not have stated it any clearer: "The preference for literalism in determining the effect of a statute is based on the constitutional doctrine of separation of powers." See 2A J. Sutherland, supra, § 46.03, p. 135. Although I acknowledge that the majority may disagree with such a rationale, its assertion as to the lack of support for my contention is demonstrably incorrect.

## C

As I noted previously, I believe that the majority's approach to statutory interpretation is misguided inasmuch as it disavows the plain meaning rule, is premised on a search for the subjective intent of the legislature and because the majority fails to provide adequate guidance as to the manner in which statutes will be interpreted in future cases. I offer, instead, the following alternative method of interpreting statutes.

The process of statutory interpretation involves a reasoned and ordered search for the meaning of the legislation at issue. In other words, we seek to determine the meaning of statutory language as would be

understood by a reasonable person reading the text of the statute.

In determining this objective meaning, we look first and foremost to the words of the statute itself. If the language of a statute is plain and unambiguous, we need look no further than the words themselves, unless such an interpretation produces an absurd result. In seeking the plain meaning of a statute, we generally construe words and phrases "according to the commonly approved usage of the language"; General Statutes § 1-1 (a); in the context of the entire statute and employ ordinary rules of grammar. In addition, we may apply the ordinary canons of judicial construction in seeking the plain meaning, recognizing that such canons are not infallible in aiding the search for plain meaning.

When, and only when, the meaning of a statute cannot be ascertained in this fashion, we next eliminate all possible interpretations that render the statutory scheme incoherent or inconsistent. If more than one reasonable interpretation of the statute remains, we next consider the statute's relationship to other existing legislation and to common-law principles governing the same general subject matter and eliminate any interpretations incompatible with this legal landscape.

If ambiguity still remains, we seek to uncover the meaning of the statute by way of review of the statute's legislative history and the circumstances surrounding its enactment. Finally, if we are still left with an ambiguous statute after resort to all the foregoing tools of statutory interpretation, we apply any applicable presumptions in reaching a final interpretation.

This approach is premised on the notion that statutory text should be the polestar of a court's search for the meaning of a statute. This approach reflects the foregoing philosophy by attributing primary importance

to statutory text and reaffirming this court's continued adherence to the plain meaning rule.

Moreover, inherent in the framework of this approach is the acknowledgment that there are statutes containing language that is ambiguous or, if interpreted according to its plain meaning, susceptible to producing an absurd result. Under such circumstances, the framework envisions a court's consideration of related statutes in an attempt to discern the statute's meaning. Consideration of related statutes as a potential second step is premised upon the notion that courts should endeavor to uncover the meaning a reasonable person reading the text of the law likely would attribute to the statute. Thus, such a tool is likely to be useful in eliminating possible interpretations that, although plausible given the language of a statute, become implausible when considering, first, the relevant statutory scheme and, if necessary, the broader legal landscape.

In addition, my approach to statutory interpretation permits the statutory interpreter to consider legislative history only when the utilization of other enumerated tools of construction has not produced a single, reasonable interpretation. Among the principal reasons for the diminished role that this framework ascribes to legislative history are the following. Most fundamentally, legislative history is generally used to attempt to gain insight into subjective legislative intent, which I believe should not be the endeavor of the interpretative process.

Moreover, even if it is assumed that the uncovering of subjective legislative intent were a worthy enterprise, legislative history is an unreliable source for the discovery of such intent. For example, it is unrealistic to think that such history sufficiently can reveal the mental states of a majority of the legislators as well as the

executive who signs the particular legislation into law. Yet, it is only this intent, and not that of a committee or of an individual legislator, that is arguably even relevant to the construction of a statute. In addition, other commentators properly have questioned the reliability of legislative history because of concerns over the manipulation by legislators or interest groups seeking to influence judicial interpretation after having failed to have their views adopted in the text of the legislation. See, e.g., A. Scalia, supra, p. 34.

A final critique of legislative history is that "it has facilitated rather than deterred decisions that are based upon the courts' policy preferences, rather than neutral principles of law." Id., p. 35. It is for these reasons that many scholars and jurists are increasingly coming to share the view of John M. Walker, Jr., the chief judge of the Second Circuit Court of Appeals, that, "[b]ecause of problems associated with legislative history, including its unreliability, manipulability, and lack of authority as law, I have come to attach very little, or no, weight to it . . . ." J. Walker, Jr., supra, 58 N.Y.U. Ann. Surv. Am. L. 233. This court should do the same.[23]

Finally, substantive presumptions should generally be applied only after utilization of all of the other tools of construction has failed to produce a reasonable interpretation. Such presumptions essentially are rules that "load the dice for or against a particular result"; A. Scalia, supra, p. 27; and, thus, should be employed as

---

[23] The majority rhetorically asks why, if I believe that there are so many problems with legislative history, should legislative history have *any* place in my approach to statutory construction. My answer is simple. I believe that this court should attach the most weight to the most reliable indicators of a statute's meaning and the least weight to the least reliable indicators. Legislative history, in my view, is less reliable than other tools, but may have some usefulness under circumstances in which the other tools of interpretation fail to produce a single, reasonable meaning.

a last resort, after all other attempts to garner meaning have been exhausted. See id., pp. 27–29.[24]

For the foregoing reasons, I respectfully dissent.

---

[24] As I noted previously, I would leave for another day the question of whether, because of the constitutional underpinnings embodied in its fair warning rationale, the rule of lenity should be employed immediately upon determining that the text of a criminal statute is ambiguous, or whether it should, along with other substantive presumptions, be employed only as a last resort after all of the relevant tools of construction have been employed.